1  Mia S. Blackler (SBN 188112)
   Laura L. Lutz (SBN 313527)
2  LUBIN OLSON & NIEWIADOMSKI LLP
   The Transamerica Pyramid
3  600 Montgomery Street, 14th Floor
   San Francisco, California 94111
4  Telephone:    (415) 981-0550
   Facsimile:    (415) 981-4343
5  mblackler@lubinolson.com
   llutz@lubinolson.com
6
   Attorneys for Plaintiff FROME WYE LIMITED
7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  FROME WYE LIMITED,                    Case No. 3:23-cv-06153

12              Plaintiff,               **COMPLAINT FOR DECLARATORY
                                         AND INJUNCTIVE RELIEF**
13         v.
                                         Trial Date:          Not set
14  HOSIE RICE LLP, a California limited
    liability partnership; SPENCER HOSIE, an
15  individual; DIANE RICE, an individual,

16              Defendants.

17

18  TO THE COURT, THE PARTIES, AND THEIR ATTORNEYS OF RECORD:

19         Plaintiff Frome Wye Limited ("Frome Wye"), by and through its undersigned counsel,

20  alleges as follows:

21                          **INTRODUCTION**

22         1.     This action arises out of a law firm funding agreement, titled as the "Amended and

23  Restated Law Firm Funding Agreement" and dated on or about September 10, 2018 (the "LFFA")

24  between Frome Wye, and Defendants Hosie Rice LLP ("Firm"), Spencer Hosie ("Hosie") and

25  Diane Rice ("Rice" and together with Hosie, "Partners").  As part of the security for any amount

26  owed to Frome Wye pursuant to the LFFA, Partners granted Frome Wye a third priority lien

27  position perfected security interest against certain residential real property in Marin County.  This

28  security interest was perfected through a recorded deed of trust against the property.

1  Notwithstanding Frome Wye's perfected security interest in its collateral, Defendants are

2  attempting to close a sale of the property without paying amounts owing to Frome Wye from the

3  sale proceeds.  By this action, Frome Wye seeks to enforce its deed of trust lien and ensure that it

4  is paid if the subject property is sold.

5  **PARTIES**

6         2.      Frome Wye is a Private Limited Company under the laws of England and Wales

7  that provides litigation finance funding to claimholders and law firms. Frome Wye's principal

8  place of business is 8 Bloomsbury Street, London, England, WC1B 3SR.

9         3.      Upon information and belief, Firm is a California limited liability partnership with

10  its principal place of business in San Francisco, California.

11         4.      Upon information and belief, Hosie is a citizen and resident of California.

12         5.      Upon information and belief, Rice is a citizen and resident of California.

13  **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

14         6.      This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2), in that it is a

15  civil action between citizens of a state and citizens or subjects of a foreign state, in which the

16  matter in controversy exceeds, exclusive of costs and interest, seventy-five thousand dollars.

17         7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all

18  Defendants reside in this judicial district and conduct business in this judicial district and the

19  transaction that gives rise to this dispute took place in this district. Moreover, venue is proper in

20  this Court pursuant to Section 18.12.13 of the parties' agreement (the LFFA), which specifically

21  allows "Firm and [Frome Wye] [to] seek[] emergency equitable remedies from a court of

22  appropriate jurisdiction …."

23         8.      Intradistrict assignment to the San Francisco Division is proper pursuant to Local

24  Rules 3-2(c) and (d) because a substantial part of the events or omissions which give rise to this

25  action occurred in the County of Marin.

26  **FACTUAL ALLEGATIONS**

27  **The Loan and its Security**

28         9.      Frome Wye is a litigation finance business that provides funding to plaintiffs and

1   law firms.  Law firms and their clients use Frome Wye funding to cover costs associated with high

2   value, commercial and intellectual property litigation such as payments for expert witnesses.

3          10.     Partners are active members of the State Bar of California, name partners of law

4   firm Hosie Rice LLP, and owners of a multi-million dollar residence located at 331 Golden Gate

5   Avenue, Belvedere, California 94920 (the "Property") since at least 1989 according to title

6   records.

7          11.     Firm obtained funding from Frome Wye pursuant to the LFFA, a copy of which is

8   attached hereto as **Exhibit A**.  As set forth in Section 1.9 of the LFFA, the LFFA provided a

9   maximum funding level of $2,000,000.

10         12.     Defendants sought funding to pay part of Firm's monthly operating expenses,

11  including out-of-pocket costs and expenses related to certain cases ("Contingency Cases") (*see*

12  Exh. A, § 1.10), which Firm pursued for its clients (*see* Exh. A, p. 1).  Frome Wye provided

13  significant funding to Firm, and then Firm was supposed to repay Frome Wye when it received

14  "Gross Revenue" in relation to any Contingency Case. Gross Revenue was defined to include any

15  payments received by Firm pursuant to or connection with any Contingency Cases, including any

16  payment to Firm in connection with successful case resolutions (*see* Exh. A, § 1.16) or any other

17  payments received by Firm as a result of settlement or verdict (*see* Exh. A, § 1.31).

18         13.     Essentially, as described by a JAMS arbitral tribunal: "[A]t bottom, the business

19  transaction is quite simple: [Firm] needed capital to pursue claims for its clients; Frome Wye

20  would lend money to enable [Firm] to litigate the claims; [Firm] would repay Frome Wye when it

21  received payments in respect of the successful outcomes in cases whether by verdict, by settlement

22  or otherwise."

23         14.     Pursuant to Sections 11.1.3 and 13.6 of the LFFA, Frome Wye was granted a

24  continuing, third priority, perfected security interest in the "Partner Collateral" and all proceeds

25  thereof.  Section 1.23 of the LFFA defines "Partner Collateral" as "all present and future right,

26  title and interest of either Partner[1] (or both Partners) in 331 Golden Gate Avenue, Belvedere, CA

---

27

28  [1] Pursuant to the LFFA, Hosie and Rice are the defined Partners.

94920."

15.     The above security interest was evidenced by a recorded Deed of Trust with Assignment of Rents dated October 10, 2018, and recorded on October 11, 2018 as Document No. 201835545 in the Official Records of the Marin County Recorder's Office ("DOT").

16.     At the time the DOT recorded against the Property, the DOT was junior to two previously-recorded deed of trust liens in favor of First Republic Bank and the Perkins Coie law firm.  After the DOT was recorded, the California Franchise Tax Board ("FTB") and the Internal Revenue Service ("IRS") subsequently recorded notices of tax liens against the Property.  The FTB recorded its Notice of Tax Lien on January 25, 2019.  The IRS' Notices of Federal Tax Lien recorded in January and October 2020, long after all funds paid from Frome Wye under the LFFA had been disbursed to Firm.

**Firm's Drawdowns and Default**

17.     After entering into the LFFA, Firm drew down on the facility.  Initially, Firm drew down a total of $550,000 between October and December 2018, and a further $800,000 between January and April 2019.

18.     Following settlement of one of its cases in or around December 2018, Firm was obligated to make an interim repayment to Frome Wye under the LFFA.  If Firm had failed to make that payment, Frome Wye would have been entitled at that stage to enforce its DOT lien against the Property.  It was never disputed by Firm or Partners in 2018 that the security was perfected and choate at that time. That said, there was no need for Frome Wyte to enforce its security interest in 2018 because Firm met its interim repayment obligation (and thereafter continued to draw down further on the LFFA).

19.     All funds disbursed from Frome Wye to Firm under the LFFA were disbursed between October 2018 and April 2019.  No funds were disbursed thereafter, and no further repayments were made, after April 2019.

20.     Notwithstanding its repayment obligation, Firm has failed to make any payments under the LFFA to Frome Wye since April 2019.  However, Defendants repeatedly acknowledged Firm's debt owing to Frome Wye until at least August 20, 2020.

**The Notice of Default and Arbitration**

21.     On July 25, 2019, Hosie informed Frome Wye that a provisional settlement had been reached on one of the Contingency Cases (the "Space Data Case").  Following a fee dispute between Firm and its client on the Space Data Case, Firm was awarded $4.5 million in a final award dated January 16, 2020 ("Space Data Award").

22.     In August 2020, Frome Wye commenced a nonjudicial foreclosure proceeding by recording a notice of default against the Property ("Notice of Default"). A copy of the Notice of Default is attached hereto as **Exhibit B**.  At that time, the sum of $1,156,723.48 was due and owing to Frome Wye as set forth in the Notice of Default, consisting of $800,000 in principal and $356,723.48 in accrued interest.

23.     Pursuant to the terms of the LFFA, Firm and Partners commenced a JAMS arbitration in Delaware on September 9, 2020 for the purpose of challenging whether the Space Data Award triggered a repayment obligation to Frome Wye under the LFFA, and to enjoin Frome Wye's foreclosure proceeding, which was suspended.

24.     On or about July 3, 2021, the JAMS arbitral tribunal issued an Order finding that "under the unambiguous terms of the LFFA, the amount awarded to [Firm] in the fee arbitration between [Firm] and Space Data is Gross Revenue and a Revenue Event which gives rise to a repayment obligation."

25.     On or about May 17, 2022, the JAMS arbitral tribunal issued its Final Award, confirming Firm's debt to Frome Wye as of May 17, 2022 as: "the amount of $800,000 plus interest of $1,267,200 less credits of $250,200 for a total of $1,817,000."  Interest and other charges continue to accrue as provided herein until the amounts due under the LFFA are paid in full to Frome Wye.

26.     Defendants have failed and refused to pay any of the principal or interest due to Frome Wye.

27.     On June 1, 2022, Frome Wye filed a Petition for Confirmation of Arbitration Award in the related case, *Frome Wye Limited v. Hosie Rice LLP, et al.*, United States District Court for the District of Delaware, Case No. 22-MC-CFC (the "Related Case").  The Arbitration

1  Award was confirmed in favor of Frome Wye on September 18, 2023.

2  **The Imminent Sale of the Property**

3      28.     In February and May of 2023, the senior lenders, First Republic Bank and Perkins

4  Coie, recorded notices of default and began their respective nonjudicial foreclosure proceedings

5  against the Property.  According to public records, Perkins Coie noticed a foreclosure sale of the

6  Property for November 16, 2023, which date was subsequently postponed to December 7, 2023.

7  Attached hereto as **Exhibit C** is a copy of Perkins Coie's Notice of Trustee's Sale.

8      29.     In the face of multiple nonjudicial foreclosure proceedings against the Property,

9  Partners marketed the Property for sale.  Upon information and belief, the Property went into sale

10 contract after being listed on the market for several months.  The sale is scheduled to close on or

11 around December 1, 2023.

12     30.     Upon learning of the pending sale, Frome Wye, by and through its counsel,

13 contacted the listing agent on November 6, 2023, and requested escrow contact information for the

14 purpose of submitting a demand for payment into escrow.  This request was ignored.

15     31.     Frome Wye subsequently learned that escrow was pending with Fidelity National

16 Title.  Accordingly, Frome Wye submitted a payment demand for $1,817,000 by and through its

17 counsel, on November 22, 2023.  This demand was emailed (where email addresses known) and

18 overnighted to the listing agent, escrow, and the junior creditors IRS and FTB.  A copy of the

19 November payment demand sent to escrow is attached hereto as **Exhibit D**.

20     32.     Based on its review of an Estimated Sellers' Statement and subsequent

21 communications between the parties and their respective counsel, Frome Wye has learned that

22 Defendants are attempting to close the sale of the Property without payment of the $1,817,000

23 demanded by and owing to Frome Wye.

24     33.     As of the date and time of this complaint, it is unknown whether escrow still

25 intends to close the sale around Frome Wye, or the respective positions of the taxing authority

26 lienholders in the face of this demand.

27

28

## **FIRST CAUSE OF ACTION**

### **(DECLARATORY AND INJUNCTIVE RELIEF)**

34.     Frome Wye incorporates the above allegations in paragraphs 1 through 33 and incorporates them as though set forth fully herein.

35.     An actual controversy between Frome Wye and Defendants exists relative to the DOT and Frome Wye's rights to a portion of the sale proceeds from the pending sale of the Property.

36.     Frome Wye prays that the Court adjudicate the rights, interests, duties and obligations of Frome Wye and Defendants under the DOT and pending sale of the Property, and Frome Wye specifically prays that the Court determine that Frome Wye should receive $1,817,000 from the proceeds of the sale of the Property.

37.     In conjunction therewith, Frome Wye requests that this Court issue temporary and preliminary injunctive relief to prohibit Defendants, and their agents working in concert with Defendants and at Defendants' direction, from taking any action to transfer or dissipate $1,817,000 of the sale proceeds of the Property that Frome Wye claims are due and owing pending further court order or stipulation to resolve the controversy between the parties.

38.     Injunctive relief is necessary because Frome Wye has suffered and will imminently suffer irreparable injury as a proximate cause of Defendants' attempts to close the sale of the Property without recognizing Frome Wye's lien against the Property. Frome Wye is owed significant payment for years, and it has claimed priority over the junior taxing authorities.  It will be costly and expensive (if not nearly impossible) for Frome Wye to claw back sums from the junior taxing authority creditors (or Defendants) if the sale closes and the funds to which Frome Wye is entitled are disbursed and dissipated.

39.     Frome Wye is without an adequate remedy at law because, upon information and belief, Defendants would be unable to satisfy a monetary damages award, and the best chance Frome Wye has of recouping the amounts it is owed from Firm and Partners is through the sale proceeds of the Property.  Upon information and belief, if Defendants and their agents are not enjoined from dissipating $1,817,000 of the sale proceeds of the Property, it is highly unlikely that

Frome Wye will be repaid the amounts it is owed by Defendants.

WHEREFORE, Frome Wye prays judgment as hereinafter set forth.

**<u>PRAYER FOR RELIEF</u>**

1.     For the issuance of temporary and preliminary injunctive relief, to prohibit Defendants, and their agents working in concert with Defendants and at Defendants' direction, from taking any action to transfer or dissipate $1,817,000 of the sale proceeds of the Property that Frome Wye claims are due and owing pending further court order or stipulation to resolve the controversy between the parties;

2.     For a declaration of Frome Wye's and Defendants' respective rights, duties, interests and obligations; and

3.     For such other and further relief as the Court may deem proper.

Dated:  November 28, 2023               LUBIN OLSON & NIEWIADOMSKI LLP

By:       /s/ Mia S. Blackler
                 Mia S. Blackler
                 Attorneys for Plaintiff FROME WYE LIMITED

# Exhibit A

EXECUTION COPY

## AMENDED AND RESTATED LAW FIRM FUNDING AGREEMENT

This Amended and Restated Law Firm Funding Agreement (this "Agreement") is made and entered into as of the date of last signature below (the "Effective Date") by and between Hosie Rice LLP ("Firm"), each of the individuals identified on the signature pages of this Agreement under the header "Partners" (individually, a "Partner" and collectively, the "Partners") and Frome Wye Limited, incorporated and registered in England and Wales ("Funder").

WHEREAS, Firm is seeking funding to pay a portion of Firm's monthly operating expenses, including out-of-pocket costs and expenses which Firm has agreed or will agree to advance to enable Firm's clients (the "Claimholders") in the Contingency Cases (defined below) to pursue the causes of action (individually, a "Claim" and collectively, the "Claims") set forth in the pleadings filed against the opposing parties named therein (individually or collectively, the "Defendants"); and

WHEREAS, Firm, Partners and Funder entered into a Law Firm Funding Agreement effective as of August 7, 2018 (the "Original Agreement") and now wish to amend and restate the Original Agreement in its entirety as set forth herein and Funder is willing to provide funding to Firm on the terms set forth herein.

NOW, THEREFORE, intending to be bound hereby, Firm, Funder and the Partners hereby agree as follows:

1. DEFINITIONS

1.1    "Additional Committed Amount" means two hundred fifty thousand dollars ($250,000).

1.2    "Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

1.3    "Arrangement Fee" means ten thousand dollars ($10,000).

1.4    "Bankruptcy Code" means Title 11 of the United States Code.

1.5    "Closing" means the event at which Funder and Firm shall exchange the deliverables set forth in Sections 12.2 and 12.3.

1.6    "Closing Date" means the date for the Closing as stated in the Closing Notice.

1.7    "Closing Notice" means notice, in the form attached hereto as Exhibit B that Funder desires to proceed with the Closing.

**EXECUTION COPY**

1.8 "Collateral Account" means a segregated deposit account held by Firm, the details of which are provided for in Exhibit F, for the sole purpose of allowing Firm to receive Contributions and to make permitted payments and distributions.

1.9 "Committed Amount" means the Original Committed Amount (which will be available on a revolving basis in accordance with clause (A) of Section 4.1) and each Additional Committed Amount (which once repaid to Funder, will not be available to be redrawn); provided, however, that the Committed Amount (i) may be decreased by Funder at its discretion upon notice to Firm if Funder believes that it is reasonably unlikely that there will be sufficient future Revenue Events to repay the Committed Amount prior to the Maturity Date and (ii) shall not exceed two million dollars ($2,000,000).

1.10 "Contingency Case" means each matter identified in Exhibit A and any other matter in which Firm becomes engaged to act on a contingency basis (including partial or hybrid contingency fee matters in addition to 100% contingency fee matters) during the term of this Agreement.

1.11 "Contingency Case Costs" means reasonable costs and/or expenses (excluding attorney fees) that are incurred by Firm (A) directly in connection with the pursuit of Revenue Events involving one or more of the Contingency Cases, (B) after the Closing Date and (C) pursuant to the terms of the respective Retainer Agreements.

1.12 "Contributions" means any one or more payments made by Funder to Firm, which payment(s) shall be deposited into the Collateral Account for payment of Operating Expenses pursuant to Section 4.2.

1.13 "Firm Collateral" means, collectively, (i) all present and future Revenue Events, Gross Revenues, and any payments, distributions, recoveries, and/or proceeds resulting therefrom or attributable thereto (including any and all rights of Firm and/or any Partner to receive any of the foregoing), (ii) all present and future right, title and interest of the Firm in its discounted deferred fees in the Space Data Case and (iii) the Collateral Account or any other account of Firm or any Partner which holds any such payments, distributions, recoveries, and/or proceeds.

1.14 "Firm Transformation Event" means the occurrence of any of the following events: (a) the sale or other disposition of all or substantially all of the assets of Firm, (b) the sale or other transfer of any of the membership interests of Firm, (c) any merger, consolidation or other transaction involving Firm pursuant to which the Partners do not own and control all of the membership interests (or equivalent securities) of the surviving entity immediately following such transaction, (d) the expiration of the period for the duration of Firm as provided for in Firm's partnership agreement, as in existence on the Effective Date, (e) any event which results in Firm ceasing to exist or (f) Firm is no longer the counsel of record on a Contingency Case.

1.15 "Funder's Minimum Return" means two hundred fifty thousand dollars ($250,000).

2

**EXECUTION COPY**

1.16   "Gross Revenue" means any recovery, payment, gross revenue, and/or other proceeds (including any non-monetary consideration) paid to Firm for its own account by Claimholders, Defendants or any third party pursuant to or in connection with any of the Contingency Cases or any Revenue Event including, (i) all amounts paid in cash or in kind to Firm upon settlement or judgment of any Claim and (ii) any and all other consideration transferred to Firm in connection with the resolution of any Claim. For avoidance of doubt, if the scope of proceeds from a Revenue Event includes, or is supplemented by proceeds paid to Firm for its own account for rights, claims, or causes of action in addition to the Claims, there shall be no apportionment, allocation, or offsetting on account of any such right, claim, or cause of action for purposes of determining the Gross Revenue paid to Firm pursuant to such Revenue Event or supplement thereto; rather, 100% of the recovery, payment, gross revenue, and/or other proceeds (including any non-monetary consideration) paid to Firm pursuant to such Revenue Event or supplement thereto shall constitute "Gross Revenue" hereunder.

1.17   "Insolvency Event" means with respect to Firm or any Partner (the "Insolvent Party"), (i) the commencement of a voluntary case by the Insolvent Party under the Bankruptcy Code; (ii) the commencement of an involuntary case against the Insolvent Party under the Bankruptcy Code and the petition is not controverted or dismissed within 60 days after commencement of the case; (iii) a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of the Insolvent Party; (iv) the Insolvent Party commences (including by way of applying for or consenting to the appointment of, or the taking of possession by, a rehabilitator, receiver, custodian, trustee, conservator or liquidator of the Insolvent Party or all or any substantial portion of its property) any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation, rehabilitation, conservatorship or similar law of any jurisdiction whether now or hereafter in effect relating to the Insolvent Party; (v) any such proceeding of the type set forth in clause (iv) above is commenced against the Insolvent Party to the extent such proceeding is consented to by the Insolvent Party or remains undismissed for a period of sixty (60) days; (vi) the Insolvent Party is adjudicated insolvent or bankrupt; or (vii) any order of relief or other order approving any such case or proceeding is entered.

1.18   "Maturity Date" means the date that is the thirty (30) month anniversary of the Closing Date; provided, however, that for each Contingency Case which triggers an Additional Committed Amount in accordance with clause (B) of Section 4.1, the Maturity Date shall be extended by an additional one hundred eighty (180) days, but in no event, shall the Maturity Date extend beyond the fifty-four (54) month anniversary of the Closing Date.

1.19   "Operating Expenses" means Overhead Costs and/or Contingency Case Costs.

1.20   "Original Committed Amount" means one million dollars ($1,000,000).

1.21   "Outstanding Principal" means any and all outstanding amounts owed to Funder under this Agreement, including any Contributions that have been made by Funder to Firm and not repaid pursuant to the provisions of Section 13.2, provided, however, that any interest owed

EXECUTION COPY

to Funder pursuant to Sections 5.1 or 5.2 shall only be included in the Outstanding Principal in accordance with Sections 5.1 and 5.2 respectively.

1.22    "Overhead Costs" means salaries, overhead and administrative costs and expenses that Firm incurs in carrying out Firm's day-to-day activities.

1.23    "Partner Collateral" means all present and future right, title and interest of either Partner (or both Partners) in 331 Golden Gate Avenue, Belvedere, CA 94920.

1.24    "Partner Compensation" means any distribution of assets of Firm to one or more Partners, including partner draws, dividends, withdrawals, distributions, salary, compensation, and bonuses.

1.25    "Partner Termination Event" means any Partner (i) ceases to be a partner of Firm for any reason, including, but not limited to, by reason of death, resignation or termination or (ii) is not spending 100% of his working time on behalf of Firm or is otherwise not fully engaged in the day to day operations of Firm.

1.26    "Party" means a party to this Agreement and "Parties" means Firm, Partners and Funder.

1.27    "Person" means any individual or any partnership, corporation, estate, trust, limited liability company, or other legal entity.

1.28    "Privileged Materials" means any documents or other information, embodied in any form, that (i) relate to the Claims and (ii) are subject to an attorney-client, work-product or any other privilege held by Claimholders.

1.29    "Related Materials" means any documents or other information, embodied in any form, related to the Claims, including any documents or other information responsive to the preliminary due diligence checklist attached hereto as Exhibit C.

1.30    "Retainer Agreements" means each of the agreements between Firm and the respective Claimholders, where such agreement provides for Firm's representation of such Claimholders in connection with the pursuit of the respective Claims and/or Revenue Events.

1.31    "Revenue Event" means the receipt of Gross Revenue by Firm, including as a result of:

   (A)    any release (including a general waiver or general release), dismissal, covenant not to sue, or other document or transaction or series of transactions (including any assignment or license) that would operate to settle, dismiss, or otherwise dispose of, resolve, or satisfy all or part of:

       (i)    the Claims (or any portion thereof); and/or

       (ii)    any litigation, arbitration, or administrative proceeding involving the Claims (or any portion thereof), whether or not such release, dismissal, covenant not to sue, or other document or transaction or series of transactions specifically mentions the Claims; and/or

   (B)    any other final non-appealable award (including court-imposed awards and/or sanctions) or judgment in any Claimholder's favor against any third party, entered in connection with any litigation, arbitration, or administrative proceeding involving the Claims (or any portion thereof).

1.32    "Solvent" means, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

1.33    "Space Data Case" means Space Data Corporation v. Alphabet Inc. and Google Inc., in the United States District Court for the Northern District of California, San Jose Division, Case No.: 5:16-cv-03260-BLF (NC).

## 2.  RULES OF CONSTRUCTION

2.1    The headings of the Sections of this Agreement are inserted for convenience only and shall not constitute a part of or affect in any way the meaning or interpretation of this Agreement.

2.2    If any expiration or milestone date calculated under this Agreement occurs on a weekend or a U.S. Federal holiday, such expiration or milestone date shall be deemed to occur on the next day that is not a weekend or a U.S. Federal holiday.

2.3    The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation", whether or not so followed.

2.4    The phrase "and/or" when used in this Agreement shall be deemed in each case to mean each of "and" and "or" taken together or individually.

2.5    Each covenant or obligation contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant or agreement contained herein, so that compliance with any one covenant or agreement shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant or

agreement.

2.6    Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be whether such action is taken directly or indirectly by such Person.

2.7    All references to any instruments or agreements shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof, in each case. All references to Persons include their respective successors and assigns (to the extent permitted under this Agreement). Except as otherwise expressly provided herein, all references to statutes and related regulations shall include any amendments of the same and any successor statutes and regulations.

2.8    Whenever any provision in this Agreement refers to the knowledge (or an analogous phrase) of Firm or any Partner, such words are intended to signify that Firm or such Partner has actual knowledge or awareness of a particular fact or circumstance or that Firm or such Partner, after due inquiry, knows or is aware of such fact or circumstance or if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance.

2.9    Where any Party has a best efforts obligation pursuant to this Agreement, time is of the essence.

2.10   Subject to any express written provision to the contrary, (i) each Party shall each bear its own costs incurred in relation to this Agreement; and (ii) nothing in this Agreement is intended to serve as a waiver of any rights or remedies that may be available to any Party in the event of a breach of any obligation, representation, or warranty by any other Party.

## 3.  FUNDER DILIGENCE

3.1    Prior to the Closing Date, Firm shall use best efforts to aid and assist Funder in pursuing and completing its pre-Closing due diligence and its analysis and ongoing understanding of Firm, the Claims, Claimholders and the Contingency Cases.

3.2    Firm shall provide Funder with access to all Related Materials in the possession, custody, or control of Firm and use best efforts to provide Funder with access to all Related Materials in the possession, custody, or control of Claimholders.

3.3    Firm shall not disclose to Funder or provide Funder with access to any (i) information where it would be in breach of a pre-existing and binding legal obligation (e.g. a protective court order, or client confidentiality) to do so or (ii) Privileged Materials.

3.4    Where Firm withholds any Related Materials, Firm shall notify Funder that materials have been withheld and provide reasonable details of the reason for withholding. Firm will upon Funder's reasonable request use best efforts (including seeking client or other counterparty

**EXECUTION COPY**

consent, where appropriate) to remove any restrictions on sharing information with Funder.

4. FUNDER CONTRIBUTIONS

4.1     As of the Closing Date and for the period extending to the Maturity Date, Funder shall make:

    (A)     the Original Committed Amount available to Firm on the basis that if a Claim (other than the Space Data Case) results in a Revenue Event before the twenty-four (24) month anniversary of the Closing Date, then Firm may redraw fifty percent (50%) of the Original Committed Amount repaid to Funder pursuant to Section 13; and

    (B)     the Additional Committed Amount available to Firm for each Contingency Case (but not to exceed four (4) Contingency Cases) in which (i) Firm becomes engaged after the Effective Date and is entitled to receive at least fifteen percent (15%) of any proceeds to be paid in connection with such Contingency Case and (ii) Funder receives a copy of the respective Retainer Agreement and notifies Firm that Funder's underwriting criteria is satisfied.

4.2     Subject to each of the terms and conditions in this Agreement, after the Closing Date, Firm may, by email to jdickie@woodsford.co.uk, request Funder to make Contributions (each a "Funding Request"), and Funder shall make Contributions in accordance with each such Funding Request, but only if each of the following conditions are satisfied:

    (A)     only one (1) Funding Request can be made each calendar month, no later than three (3) business days prior to the date such Contribution is requested to be made which must be before the Maturity Date;

    (B)     such Funding Request must include a statement signed by both Partners certifying: (i) the amount of Partner Compensation paid, or otherwise made, by Firm since the Closing Date and (ii) that Firm is not in breach of any of its obligations to Funder including, in particular Section 9.3.2;

    (C)     such Contributions (i) shall not exceed two hundred thousand dollars ($200,000) and (ii) when added to all prior Contributions shall not exceed the Committed Amount;

    (D)     such Contributions may only be used by Firm to pay up to one hundred fifty thousand dollars ($150,000) of Overhead Costs and fifty thousand dollars ($50,000) of Contingency Case Costs, which are demonstrated by Firm to Funder's reasonable satisfaction to have been properly incurred by Firm; and

    (E)     the entire amount of prior Contributions must have been spent before Funder shall be obligated to make any additional Contributions.

4.3     Firm may make withdrawals from the Collateral Account to pay Operating Expenses without making any request to Funder so long as Firm does so in compliance with the terms

**EXECUTION COPY**

of this Agreement.

## 5. INTEREST

5.1    Interest shall (i) accrue on all Outstanding Principal at the rate of two percent (2%) per every thirty (30) days, calculated on a daily basis, (ii) be payable to Funder in accordance with Section 13.2 and (iii) be compounded with the Outstanding Principal on the annual anniversary of the Closing Date immediately following the date such interest began to accrue.

5.2    If any Outstanding Principal or any interest or other amount owed to Funder under this Agreement remain outstanding as of the Maturity Date, then commencing on the Maturity Date, additional interest shall (i) accrue on all such amounts at the rate of three-quarters of one percent (0.75%) per every thirty (30) days, calculated on a daily basis, (ii) be payable to Funder in accordance with Section 13.2 and (iii) be compounded with the Outstanding Principal every thirty (30) days.

## 6. TAXES

If any taxes, levies, imposts, deductions, charges or withholdings ("Taxes") shall be required by law to be deducted from or in respect of any amount payable to Funder by Firm (or Partners, as the case may be) under this Agreement, then (i) such amount shall be increased as necessary to ensure that, after all required deductions for such Taxes are made (including deductions applicable to any increases to any amount under this Section 6.1), Funder receives the amount it would have received had no such deductions been made, (ii) Firm (or Partners, as the case may be) shall make such deductions, (iii) Firm (or Partners, as the case may be) shall timely pay the full amount deducted to the relevant taxing authority or other authority in accordance with applicable law and (iv) within 30 days after such payment is made, or as soon as practicable thereafter, Firm (or Partners, as the case may be) shall deliver to Funder an original or certified copy of a receipt evidencing such payment.

## 7. FUNDER'S RIGHTS TO PROVIDE FURTHER FUNDING

7.1    Firm hereby grants Funder the exclusive right (i) to make the first offer to provide additional financing to Firm, and/or to make an investment, in connection with any litigation matter in which Firm is involved (each, a "Litigation Funding Opportunity") and (ii) without limiting the effect of Section 9.2.2, to match any subsequent third party offer that Firm finds acceptable regarding a Litigation Funding Opportunity.

7.2    Upon determining that any such third party offer is acceptable, Firm will provide Funder with a copy of such offer and Funder will then have fifteen (15) days in which to match the terms set forth in such offer, during which time Firm may not accept such third party offer.

7.3    Firm will provide all assistance necessary to aid Funder in evaluating any such offer during

**EXECUTION COPY**

the applicable fifteen (15) day period.

7.4    If Funder elects to match any such offer, then Firm must enter into an agreement with Funder on the terms as substantially set forth in such offer no later than thirty (30) days from the date that Funder matches such offer.

## 8.  FIRM'S PROFESSIONAL OBLIGATIONS TO CLIENTS

8.1    Nothing in this Agreement is intended to cause Firm to fail to comply with its professional obligations to its clients and Firm hereby warrants to Funder that compliance with the terms of this Agreement will not result in any such failing.

8.2    If at any time, Firm believes that performance of any of its obligations pursuant to this Agreement would cause Firm to breach its professional obligations, including those provided for in Section 8.4, Firm shall immediately notify Funder and shall cooperate in good faith with Funder to resolve any such issues.

8.3    Firm shall indemnify and hold Funder harmless from any material negative consequences caused to Funder by reason of any conflict between the terms of this Agreement and Firm's paramount professional obligations to its clients.

8.4    Firm shall (a) comply with all of its professional obligations; (b) always act in the best financial interests of each Claimholder and use best efforts to pursue the Claims; (c) not permit the Funder, or consideration of this Agreement or the transactions contemplated hereby, to influence its professional judgment in determining the course or strategy of any of the Claims, including the decisions of whether to settle or the amount to accept in any settlement; (d) not pass any portion of the cost of this Agreement or the transactions contemplated hereby to any Claimholder; and (e) consider on a case-by-case basis whether to disclose the existence of this Agreement to Claimholders, and notwithstanding Section 16, Funder hereby consents to any such disclosure that is required by any applicable professional obligations.

8.5    For avoidance of doubt, Firm acknowledges that at no time shall Funder or its agents or representatives:

8.5.1.    have any control, management, or responsibility with respect to any decisions or actions involving the Claims and/or the pursuit thereof, including any litigation, appeals, and/or settlement thereof;

8.5.2.    serve as Firm's client with respect to pursuit of the Claims and/or Revenue Events; and/or

8.5.3.    provide or offer any legal advice or any legal opinions to Firm, whether regarding the Claims, litigation involving the Claims, or otherwise.

8.6    Firm acknowledges that it has relied (and shall continue to rely) on its own partners and/or

**EXECUTION COPY**

outside attorneys for any legal advice or legal opinions regarding the Claims and/or litigation involving the Claims.

8.7    Firm understands and agrees that Operating Expenses may not include all costs and expenses required to pursue the Contingency Cases and do not include any costs or expenses that are, or will be, incurred in connection with any appeal involved in the Contingency Cases.

9.    FIRM COVENANTS

9.1    Firm shall use best efforts to cause the conditions set forth in Sections 11.1.1, 11.1.2, 11.1.3, 11.1.4 and 11.1.5 to be satisfied within thirty (30) days of the Effective Date or, for conditions outside of Firm's control, as soon thereafter as possible.

9.2    From and after the Effective Date and throughout the term of this Agreement:

9.2.1.    Firm shall maintain in full force and effect its right, title, and interest in the Contingency Cases as provided for in the Retainer Agreements, and shall not amend or modify the Retainer Agreements without the prior written consent of Funder (such consent not to be unreasonably withheld).

9.2.2.    Firm shall not market, shop, entertain, acknowledge, defer, or accept third party offers or negotiate or enter into any transaction involving the sale, license, pledge, assignment, option, transfer, or other granting or waiver of any liens or rights (including security interests), contingent or otherwise, in the Retainer Agreements and/or fee income therefrom, whether directly or indirectly through an asset sale, change of control, license agreement, or through any purchase, settlement, loan or financing agreement, security or collateral agreement, or otherwise, and Firm shall immediately notify Funder of the fact of and content of any third party offers to enter into a transaction that involves the Retainer Agreements and/or fee income therefrom. Any purported transaction in breach of any of the restrictions set forth in this Section 9.2.2, shall be deemed null and void *ab initio* without limiting any other remedies available to Funder. Notwithstanding the foregoing, and for the avoidance of doubt, nothing in this Section 9.2.2 is intended, nor shall it be construed, to prevent Firm and/or Claimholders from pursuing or consummating a Revenue Event.

9.2.3.    Firm shall maintain adequate financial and other resources and use its best efforts to pursue Revenue Events in good faith including, but not limited to, pursuing any enforcement actions related to the Claims and rendering legal services with best efforts and full exertion of professional skill in accordance with the Retainer Agreements.

9.2.4.    Firm shall notify Funder of any new matter (regardless of size, value or any other consideration) in which Firm is considering an engagement, either on a contingency fee basis, or otherwise, no later than five (5) business days after

**EXECUTION COPY**

entering into such engagement, with such notice to be accompanied by demonstrable evidence reasonably satisfactory to Funder that such matter can be adequately financed and supported by Firm, and if Firm enters into such engagement on a contingency basis, the matter will be a Contingency Case.

9.2.5.   Firm shall immediately notify Funder of any litigation or governmental investigation or proceeding pending or threatened against Firm or any Partner.

9.2.6.   Firm shall provide Funder with copies of Firm's annual tax returns for calendar year 2018 and each calendar year thereafter within ten (10) days of such returns being filed with any federal or state taxing authority.

9.2.7.   neither Firm nor any Partner shall enter into any transaction, or take (or omit to take) any action, that results in a Firm Transformation Event, an Insolvency Event or a Partner Termination Event.

9.2.8.   the Partners shall not amend Firm's partnership agreement, as in existence on the Effective Date (a copy of which has been provided to Funder), without the approval of Funder (such approval not to be unreasonably withheld).

9.2.9.   neither Firm nor any Partner shall permit Partner Compensation to any Partner in any calendar year to exceed Partner Compensation to such Partner in the prior calendar year by more than ten percent (10%).

9.2.10.  Firm shall promptly pay all expenses and debts of Firm as they come due and shall immediately notify Funder if any such expenses or debts become past due or if any charges, liens or actions are filed against Firm.

9.3   From and including the Closing Date and throughout the term of this Agreement:

9.3.1.   Firm shall execute any further instruments or documents and take further action as Funder reasonably requests to perfect or continue Funder's first priority security interest in the Firm Collateral or to effect the purposes of this Agreement.

9.3.2.   Firm shall provide Funder, as soon as available, but in any event within fifteen (15) days after the end of each calendar month, with (i) a report detailing the Operating Expenses that were paid during such calendar month with Contributions, (ii) copies of all monthly bank statements for any account in which Firm maintains funds (including any client trust accounts) and (iii) a balance sheet of Firm as at the end of such calendar month, and the related statements of income or operations, shareholders' equity and cash flows for such calendar month, setting forth in each case in comparative form the figures for the previous calendar month, all in reasonable detail and prepared in accordance with generally accepted accounting standards and certified by a Partner as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of Firm in accordance with generally accepted accounting

11

standards.

9.3.3.   Firm shall provide Funder, as soon as available, but in any event within fifteen (15) days after the end of each calendar quarter, with a quarterly review of the Contingency Cases, including revised budgets and Gross Revenue expectations for each of the Contingency Cases.

9.3.4.   Firm shall provide Funder, as soon as available, but in any event within ninety (90) days after the end of each fiscal year of Firm, with a balance sheet of Firm as at the end of such fiscal year, and the related statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with generally accepted accounting standards, audited and accompanied by a report and opinion of any independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted accounting standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit.

9.3.5.   subject to Firm's compliance with all professional rules that apply for the protection of Firm's clients, Firm shall (i) not enter into any confidentiality, non-disclosure or other agreement that would prevent Firm from sharing with Funder the contents of any communications (written, oral, or otherwise) regarding potential or actual settlement of any of the Claims and (ii) provide Funder with a copy of all material documents that relate to potential or actual settlement of any of the Claims without delay.

9.3.6.   Firm shall not subordinate Funder's first priority lien and security interest in the Firm Collateral or any portion thereof, nor shall it aid or assist any third party in doing so.

9.3.7.   Firm shall maintain and use the Collateral Account pursuant to the terms of this Agreement only for the purposes of (i) receiving Contributions pursuant to Section 4, (ii) paying Operating Expenses and (iii) making distributions pursuant to Section 13.

10.   REPRESENTATIONS AND WARRANTIES

10.1   Except as set forth below or in any schedules attached hereto, Firm represents and warrants the following to be true and correct in all material respects as of the Effective Date and on each date a Contribution is requested pursuant to Section 4.2:

10.1.1   Firm is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has the power, right, and authority to enter into and perform its obligations under this Agreement;

**EXECUTION COPY**

10.1.2    Firm has taken all necessary action to authorize its execution, delivery and performance of this Agreement;

10.1.3    Firm has disclosed to Funder all parties holding voting rights (including veto rights) sufficient to control all activity of Firm;

10.1.4    this Agreement, when duly executed, will be a legal, valid and binding obligation of Firm, enforceable in all respects as against Firm;

10.1.5    entering into this Agreement, and the consummation of the transactions contemplated hereby, and the undertaking of the obligations contemplated hereby, does not and shall not violate or conflict with (i) any third party right or agreement (whether express, implied or by operation of law) with any other Person to which Firm is a party or subject or (ii) any judgment, decree, order, statute, law, regulation or ethical rule, in each case, applicable to Funder, Firm or Partners (including, in each case, with respect to the sharing of legal fees with a non-lawyer);

10.1.6    no Person other than Claimholders and Firm has any proprietary interest in the Claims, and Firm's right, title and interest to receive Gross Revenue in connection with Revenue Events involving the Claims is unencumbered by any valid lien or security interest; and there are no pledges, assignments, options, license agreements, releases, or covenants not to sue, granted with respect to any of the Claims;

10.1.7    the security interest granted to Funder herein is a first priority lien in the Firm Collateral and is not subordinated to the rights of any lien holder or third party;

10.1.8    no lien or security interest exists on or with respect to any property or asset (including any document or instrument with respect to goods or accounts receivable) of Firm;

10.1.9    each Partner and Firm is Solvent;

10.1.10    none of Firm, the Partners or any of their respective Affiliates, agents, or representatives have engaged in any conduct, or omitted to perform any necessary act, the result of which would hinder enforcement of the Claims or any portion thereof or any rights therein;

10.1.11    neither Firm, the Partners nor any of their respective Affiliates, agents, or representatives have received (i) any confidential or proprietary information of Defendants or (ii) notice of any claim, demand, or cause of action made or claimed by Defendants against Firm or any of its Affiliates, agents, or representatives;

**EXECUTION COPY**

10.1.12   no representation or warranty or other statement made by Firm in this Agreement contains any untrue statement or omits to state a material fact that would make such representation or warranty misleading in light of the circumstances in which it was made;

10.1.13   Firm has disclosed to Funder all Related Materials and Firm has no reason to believe that any Claimholder has failed to provide any Related Materials to Firm;

10.1.14   Exhibit A reflects all matters in which Firm is currently engaged to act on a contingency basis (including partial or hybrid contingency fee matters in addition to 100% contingency fee matters) or in which Firm otherwise has a contingent economic interest;

10.1.15   to the best knowledge of Firm, other than the Contingency Cases, no Claimholder is involved in any litigation, arbitration or administrative proceeding and no litigation, arbitration or administrative proceeding is threatened or pending against any Claimholder;

10.1.16   no Person is entitled to any brokerage, finders, or similar fees as a result of Firm's entering into or performance of duties and obligations pursuant to this Agreement;

10.1.17   none of the Partners have ever been convicted of a crime (i) punishable by imprisonment in excess of one year or (ii) where the elements of such crime required proof or admission of an act of dishonesty or false statement; and

10.1.18   Firm has reviewed the terms of this Agreement and the transactions contemplated hereby with counsel of its choosing.

10.2   Funder represents and warrants the following to be true and correct in all material respects as of the Effective Date:

10.2.1   Funder is incorporated and registered under the laws of the jurisdiction of its formation and has the power, right, and authority to enter into and perform its obligations under this Agreement;

10.2.2   Funder has taken all necessary action to authorize its execution, delivery and performance of this Agreement;

10.2.3   this Agreement, when duly executed, will be a legal, valid and binding obligation of Funder, enforceable in all respects as against Funder;

10.2.4   entering into this Agreement, and the consummation of the transactions contemplated hereby, does not and shall not violate or conflict with any agreement (whether express, implied or by operation of law) with any other Person to which Funder is a party or subject; and

**EXECUTION COPY**

10.2.5   Funder has reviewed the terms of this Agreement and the transactions contemplated hereby with counsel of its choosing.

11.   CONDITIONS PRECEDENT TO CLOSING

11.1   Funder's obligation to take the actions required to be taken by Funder at the Closing is subject to the satisfaction of, as of the Closing, each of the following conditions (any of which may be waived by Funder, in whole or in part):

11.1.1.   execution of the Retainer Agreements by each of Firm and the respective Claimholders and delivery of fully executed copies thereof to Funder;

11.1.2.   Funder's receipt of all Related Materials and Funder's receipt of notice from Firm that Firm has provided Funder with all Related Materials (unless Funder notifies Firm of certain omitted Related Materials after receipt of such notice, in which case, this condition shall be satisfied upon Funder's receipt of such additional Related Materials);

11.1.3.   each document (including any UCC financing statement or account control agreement) reasonably required by Funder to be entered into, filed, registered or recorded in order to create in favor of Funder, a perfected first-priority security interest in the Firm Collateral (and a third-priority security interest in the Partner Collateral), shall have been entered into, filed, registered or recorded or shall have been unconditionally delivered to Funder and be in proper form for filing, registration or recordation, as appropriate;

11.1.4.   each of Firm's representations and warranties in this Agreement shall have been true and correct in all material respects as of the Effective Date, and shall be true and correct in all material respects as of the time of the Closing as if then made;

11.1.5.   each of the covenants and obligations that Firm is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects; and

11.1.6.   no material adverse change affecting (i) Firm's rights in any of the Contingency Cases or any Claims and/or proceeds therefrom, as provided for in the Retainer Agreements or (ii) the value of any of the Contingency Cases or any Claims, shall have occurred or be anticipated as of the time of the Closing.

11.2   Firm's obligation to take the actions required to be taken by Firm at the Closing is subject to the satisfaction of the following conditions (any of which may be waived by Firm, in whole or in part):

11.2.1.   each of Funder's representations and warranties in this Agreement shall have been true and correct in all material respects as of the Effective Date, and shall be true and correct in all material respects as of the time of the Closing as if then

EXECUTION COPY

made; and

11.2.2. each of the covenants and obligations that Funder is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects.

12. CLOSING AND CLOSING DELIVERABLES

12.1 Subject to the exception set forth in Section 12.4, if the conditions set forth in Section 11 are met (or waived, as permitted in Sections 11.1 and 11.2) then the Parties are hereby obligated to complete the Closing and deliver the Closing deliverables set forth in Sections 12.2 and 12.3 on the Closing Date. The Closing will occur simultaneously at the respective locations of Funder and Firm via execution of counterpart copies that shall be delivered to each other via email or other means of delivery (as agreed upon by the Parties).

12.2 In addition to any other documents to be delivered under other provisions of this Agreement, Firm shall unconditionally deliver to Funder the following at Closing:

12.2.1. updates to the original representations and warranties delivered with this Agreement reflecting any changes that occurred from the Effective Date through the Closing Date;

12.2.2. the certificate attached hereto as Exhibit D, properly executed by Firm; and

12.2.3. the Arrangement Fee paid to Funder's bank account, the details of which are to be provided by Funder in the Closing Notice.

12.3 Subject to receipt of the documents described in Section 12.2, in addition to any other documents to be delivered under other provisions of this Agreement, Funder shall deliver to Firm the following at Closing:

12.3.1. updates to the original representations and warranties delivered with this Agreement reflecting any changes that occurred from the Effective Date through the Closing Date; and

12.3.2. a signed certificate in the form attached hereto as Exhibit E.

12.4 Subject to the provisions of Section 17, failure to consummate the Closing as provided for in this Agreement on the Closing Date, (i) will not result in the termination of this Agreement, (ii) will not relieve any Party of any obligation hereunder and (iii) will be followed by the Closing occurring as soon as practicable.

12.5 Nothing in this Agreement will obligate (or be interpreted to require) Funder to proceed

EXECUTION COPY

with the Closing if any Section 12.2 condition has not been satisfied.

13. GROSS REVENUE, DISTRIBUTION, AND SECURITY

13.1 Unless waived by Funder in writing, any Revenue Event that occurs after the Closing shall require all Gross Revenue payments be made directly into the Collateral Account. All withdrawals from the Collateral Account will be made solely for purposes of (i) distributions in accordance with the terms set forth in Section 13.2 and/or (ii) payment of Operating Expenses up to the amount of all Contributions. If a Revenue Event occurs after the Closing at a time when Firm is unable to operate the Collateral Account, then Firm shall require the payer of any Gross Revenue to directly pay Funder, to accounts specified by Funder in writing, the amount owing to Funder as determined pursuant to Section 13.2. For avoidance of doubt, after the Closing, Funder shall be entitled to distributions pursuant to Section 13.2, regardless of whether or not this Agreement has been terminated (subject to Section 17.3). The Contributions and all distributions made by, and to, Funder hereunder shall be denominated in United States dollars.

13.2 Gross Revenue that is received at any time pursuant to a Revenue Event achieved after the Closing shall be distributed in accordance with Section 13.1 within ten (10) days after such Gross Revenue is received, in the following order of priority:

13.2.1 one-hundred percent (100%) of such Gross Revenue shall be distributed to Funder until the amount of such distribution(s) equals one-hundred percent (100%) of the accrued interest owed to Funder under Section 5.2 and/or Section 17.3.3 that has not been compounded with the Outstanding Principal and not previously paid to Funder pursuant to this Section 13.2.1;

13.2.2 to the extent any Gross Revenue amounts remain after fully satisfying Section 13.2.1, one-hundred percent (100%) of such Gross Revenue shall be distributed to Funder until the amount of such distribution(s) equals one-hundred percent (100%) of the accrued interest owed to Funder under Section 5.1 that has not been compounded with the Outstanding Principal and not previously paid to Funder pursuant to this Section 13.2.2;

13.2.3 to the extent any Gross Revenue amounts remain after fully satisfying Sections 13.2.1 and 13.2.2, one-hundred percent (100%) of such Gross Revenue shall be distributed to Funder until the amount of such distribution(s) equals the greater of (x) one-hundred percent (100%) of the Outstanding Principal that has not been previously paid to Funder pursuant to this Section 13.2.3 and (y) an amount equal to (i) the Contributions plus (ii) Funder's Minimum Return less (iii) any amounts paid to Funder under Section 13.2.2 and less (iv) any amounts previously paid to Funder pursuant to this Section 13.2.3; and

13.2.4 to the extent any Gross Revenue amounts remain after fully satisfying Sections 13.2.1, 13.2.2 and 13.2.3, one-hundred percent (100%) of such Gross Revenue shall be distributed to Firm.

**EXECUTION COPY**

13.3    Partners shall exercise good behavior in connection with this Agreement such that Partners shall not do or omit to do anything (and/or shall not instruct or require Firm to do or omit to do anything) that would result in a breach of Firm's obligations to Funder and Partners shall be jointly and severally liable between and among themselves and with Firm for the payment and performance of all obligations and liabilities of Firm arising from any material breach of this Agreement by Firm. Partners agree that any obligation of Firm under this Agreement arising after a material breach of this Agreement by Firm may be enforced by Funder against a Partner or Partners without any requirement that Funder first exercise its rights against Firm.  Each Partner's obligations under this Section 13.3 are primary, continuing, absolute and unconditional, and are not subject to any counterclaim, setoff, deduction, diminution, abatement, recoupment, suspension, deferment or suretyship defense, and shall remain in full force and effect without regard to, and shall not be released, discharged, or in any way affected by, any circumstance or condition whatsoever (whether or not Partners shall have any knowledge thereof) except as may be expressly set forth herein.

13.4    Absent dishonesty, fraud, willful misconduct or willful concealment by Partners and subject to Section 13.7, nothing contained in Section 13.3 shall limit the ability of Partners to assert as a defense to any claim any defense that would be available to Firm if the claim were asserted directly against Firm.

13.5    Firm shall maintain full, accurate and complete records related to Revenue Events and Gross Revenues which are sufficient to enable any payments due under this Agreement to be accurately determined. Firm agrees to permit a certified public accountant selected by Funder to examine such records within three (3) years after the end of the calendar year to which the examined records pertain, at Funder's sole expense, for the purpose of verifying Firm's compliance with all the terms and conditions of this Agreement, including the correctness of the payments made to Funder under this Agreement; provided that Funder's selected independent certified public accountant will agree to keep the results of such examination confidential and only furnish the same to Firm and Funder.

13.6    As security for any amount owed to Funder, Firm hereby grants Funder (i) a continuing, first priority, perfected security interest in the Firm Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds thereof and (ii) a continuing, third priority, perfected security interest in the Partner Collateral, and all proceeds thereof. In the event of Firm's default or breach of any of its obligations pursuant to this Agreement, Funder shall have all the rights and remedies of a secured party under the California Uniform Commercial Code.  Furthermore, Funder shall have all rights to take any action it deems necessary or desirable to protect the Firm Collateral and/or the Partner Collateral at any time. Funder may file a financing statement or other appropriate documents with such government offices as Funder deems necessary to protect and/or perfect its security interest in the Firm Collateral and/or the Partner Collateral. Any amounts spent by Funder to protect the Firm Collateral and/or the Partner Collateral shall be deemed Contributions hereunder. Partners shall execute any further instruments or documents and take further action as Funder reasonably requests to perfect or continue Funder's third priority security interest

18

EXECUTION COPY

in the Partner Collateral or to effect the purposes of this Agreement. Partners shall not subordinate Funder's third priority lien and security interest in the Partner Collateral or any portion thereof, nor shall it aid or assist any third party in doing so. Firm hereby grants Funder an irrevocable power of attorney to take any and all actions to protect the Firm Collateral and/or the Partner Collateral at any time. If Funder has received payment of all amounts owed to it pursuant to this Agreement and no further Contributions are to be made, then, upon Firm's request, Funder shall execute all appropriate documents prepared by Firm and necessary to release Funder's security interest in the Firm Collateral and the Partner Collateral. Notwithstanding the foregoing, Funder agrees that the Partner Collateral may be sold, assigned or otherwise transferred (a "Partner Collateral Sale") with the prior written consent of Funder, such consent not to be withheld by Funder so long as prior to, or simultaneously with, a Partner Collateral Sale, Funder receives a first priority, perfected security interest in substitute collateral satisfactory to Funder.

13.7   If there is no breach of this Agreement by Firm or any Partner and the Gross Revenue from all Revenue Events is not sufficient to cover the full amount owed to Funder pursuant to Sections 13.1 and 13.2 (a "Shortfall") then, other than with respect to its rights in the Firm Collateral and the Partner Collateral, Funder shall have no right to pursue payment from Firm or Firm's non-Collateral assets or the Partners for purposes of recovering the amount of such Shortfall. For avoidance of doubt, nothing in this Section 13.7 shall serve to prohibit or limit any remedies that would otherwise be available to Funder in the event of a breach by Firm of any of its obligations to Funder.

14.   NOTICES

14.1   All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given and received when delivered by hand, or by internationally-recognized overnight courier with written confirmation of delivery, or by email transmission with an acknowledgement of success; in all cases as follows:

If to Firm and/or Partners:

Diane S. Rice and Spencer Hosie
Hosie Rice LLP
TransAmerica Building, 34th Floor
600 Montgomery Street
San Francisco, California 94111
Email: drice@hosielaw.com and shosie@hosielaw.com

If to Funder:

Frome Wye Limited
8 Bloomsbury Street London, WC1B 3SR
Email: jbarnes@woodsford.co.uk

Either Party may change the above designated recipients and addresses for such notice by providing the appropriate information in writing to the other Party.

15. LIMITATION OF LIABILITY AND WAIVER OF DEFENSES

15.1 Except for Funder's agreement to make Contributions pursuant to the terms of this Agreement, neither Funder nor its Affiliates or agents, whether by this Agreement, or otherwise, hereby assumes, becomes liable for, or agrees to pay any obligation, liability, or indebtedness of Firm or Partner which may now exist or which may arise in the future, whether associated with the Claims, or any litigation or arbitration or administrative proceeding related thereto or otherwise. Any obligations, liabilities or indebtedness of Firm including, but not limited to, liabilities relating to the Claims, or any litigation or arbitration or administrative proceeding related thereto shall remain the sole and separate responsibility of Firm, and the Parties (other than Funder) hereby agree to indemnify, defend and hold Funder, its Affiliates, and its agents harmless from and against any and all such obligations, liabilities, or indebtedness.

15.2 IN NO EVENT SHALL FUNDER BE LIABLE TO FIRM OR ANY PARTNER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL LOSSES OR DAMAGES, ARISING OUT OF THE RIGHTS GRANTED HEREBY OR A BREACH OF ANY OF THE TERMS SET FORTH HEREIN. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH IN THIS AGREEMENT, THE MAXIMUM AGGREGATE LIABILITY THAT FUNDER SHALL HAVE UNDER ANY AND ALL CLAIMS ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY PERFORMANCE, ACT, OR OMISSION IN CONNECTION THEREWITH SHALL NOT EXCEED THE UNDISBURSED PORTION OF THE COMMITTED AMOUNT.

15.3 FIRM AND EACH PARTNER WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH FIRM OR ANY PARTNER MAY HAVE TO ANY ACTION BY FUNDER IN ENFORCING THIS AGREEMENT, INCLUDING THOSE RELATING TO CHAMPERTY, MAINTENANCE AND/OR FEE SHARING PROHIBITIONS. FIRM AND EACH PARTNER WAIVES ANY IMPLIED COVENANT OF GOOD FAITH AND RATIFIES AND CONFIRMS WHATEVER FUNDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT AS OF THE DATE OF THIS AGREEMENT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR FUNDER GRANTING ANY FINANCIAL ACCOMMODATION TO FIRM.

16. CONFIDENTIALITY

16.1 Each Party agrees to exercise all reasonable precaution (no less precaution than it takes to protect its own confidential information) to retain in confidence and not to disclose to any third party any Confidential Information submitted to it by the other Parties. The Parties each acknowledge that disclosure of Confidential Information could result in irreparable injury to the business and goodwill of the other, and each agrees to notify the other immediately upon

discovering any unauthorized disclosure of such other Party's Confidential Information.

16.2    "Confidential Information" shall mean any confidential, trade secret or proprietary information belonging to a Party, including but not limited to business, strategic, financial, operating, planning or technical information of any Party, however embodied, and shall also mean the fact and existence of this Agreement, the terms and conditions of this Agreement, all communications between Funder, or Funder's agent or representative, and Firm or Claimholders regarding the Contingency Cases and/or Claims prior to and subsequent to the Effective Date, all Related Materials, all work product, and any other information identified by any of the Parties to this Agreement as "confidential," but shall specifically exclude the following information:

(A)    which, as shown by written records, was in the receiving party's possession prior to receipt without breach of a protective order, or a non-disclosure or other confidentiality obligation to the disclosing party;

(B)    which is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by the receiving party;

(C)    which is, subsequent to disclosure, independently developed by employees of the receiving party who had no access to the information; or

(D)    which is received at any time from any third party without breach of a protective order, or a non-disclosure or other confidentiality obligation to the disclosing party.

16.3    Each Party may, however, disclose Confidential Information:

(A)    to those of its employees, contractors, agents, and Affiliates to whom disclosure is necessary in order to effectuate the matters contemplated herein, subject to obligations of confidentiality at least as stringent as those contained herein;

(B)    to a counterparty in connection with a proposed merger, acquisition, financing or similar transaction, subject to obligations of confidentiality at least as stringent as those contained herein;

(C)    to its accountants, legal counsel, tax advisors, and other financial and legal advisors, subject to obligations of confidentiality at least as stringent as those contained herein and/or privilege;

(D)    in response to any subpoena or discovery request (if such disclosure consists of admissible evidence or is calculated to lead to admissible evidence), governmental mandate, regulation, or court order, in connection with any litigation or administrative proceeding, or so as to comply with any applicable law, rule or regulation; and

(E)    with the prior written consent of the other Parties;

provided, however, that prior to any such disclosure pursuant to paragraph (D) hereof, the Party seeking disclosure shall provide prompt notice of the pending disclosure to the other Parties and shall take all reasonable actions in an effort to minimize the nature and extent of such disclosure, including designating such Confidential Information under the appropriate confidentiality provisions of any applicable protective order.

**EXECUTION COPY**

16.4   In furtherance of their common legal interest in evaluating ongoing and anticipated litigation of the Claims, the Parties understand and agree that the sharing of any Confidential Information shall not waive or diminish in any way the confidentiality of such information or its continued protection under any applicable attorney-client privilege, work product doctrine, or other privilege. All Confidential Information provided by a Party that is entitled to protection under the attorney-client privilege, work product doctrine, or other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the common interest doctrine. Notwithstanding the foregoing, and for the avoidance of doubt, Firm shall not disclose any Privileged Materials to Funder, unless and until such Privileged Materials are requested by Funder. Nothing in this Section 16.4 shall be interpreted to mean that a Party would be prevented from using Confidential Information in a legal proceeding against the other Party based upon a dispute arising out of this Agreement; provided that the other Party has been notified in advance of such use or disclosure and been afforded sufficient opportunity to seek and obtain confidential treatment by the court or other entity having jurisdiction over the matter at hand.

17.   TERM AND TERMINATION

17.1   This Agreement shall be effective as of the Effective Date.

17.2   Subject to Section 17.3, this Agreement may be terminated by notice, as follows:

   17.2.1   by Funder, at any time in Funder's sole discretion, prior to providing Firm with the Closing Notice;

   17.2.2   by Funder, at any time prior to Closing, if any condition in Section 12.2 has not been satisfied as of the Closing Date and Funder has not waived such condition;

   17.2.3   by Funder, at any time in Funder's sole discretion, if a material breach of any provision of this Agreement has been committed by Firm (including, but not limited to, Firm's obligations pursuant to any of Sections 3, 7, 8, 9, 10, and 13) and such breach has not been either (i) cured by Firm within ten (10) days (or, in the case of any breach of a payment obligation, two (2) days) of receiving notice of such breach, if such breach is capable of cure, or (ii) waived by Funder;

   17.2.4   by Funder, at any time in Funder's sole discretion, in the event of a Firm Transformation Event, Insolvency Event, Partner Termination Event, or a Claimholder taking any action in connection with a Contingency Case which is prejudicial to Funder;

   17.2.5   by Funder, at any time if Funder reasonably believes that because one or more of the Claims lack merit, it is unlikely that there will be Revenue Events sufficient to repay Funder the Outstanding Principal;

   17.2.6   by Funder, at any time if any litigation or governmental investigation or proceeding is pending or threatened against Firm or any Partner which in

Funder's reasonable opinion could have a material adverse effect on Firm's ability to pursue Revenue Events (including, enforcement actions related to the Claims) or render legal services with best efforts and full exertion of professional skill in accordance with the Retainer Agreements;

17.2.7   by Firm, at any time prior to Closing in Firm's sole discretion, if any condition in Section 12.3 has not been satisfied as of the Closing Date and Firm has not waived such condition;

17.2.8   by Firm, at any time in Firm's sole discretion, if Funder is in material breach of its Section 4 obligations and such breach has not been either (i) cured by Funder within twenty (20) days of receiving notice of such breach or (ii) waived by Firm;

17.2.9   by Firm, upon two (2) business days' notice, provided that Firm is not in material breach of this Agreement, if Funder has not provided Firm with the Closing Notice on or prior to the later of (i) the thirtieth (30th) day following the Effective Date (or such later date as Firm and Funder may agree upon) or (ii) the thirtieth (30th) consecutive day the conditions set forth in Section 11.1 have each been fully satisfied; and

17.2.10  upon mutual written agreement of Firm and Funder.

17.3   Effect of termination.

17.3.1   each Party's right of termination under this Section 17 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies.

17.3.2   in the event of any termination in accordance with this Section 17 which occurs prior to the Closing:

(A)   Firm and Funder shall owe no further financial obligations to each other; and

(B)   the terms and conditions set forth in the following provisions shall survive such termination: Sections 1, 2, 14, 15, 16, 17.3, and 18.

17.3.3   in the event of any termination in accordance with this Section 17 which occurs after the Closing:

(A)   Funder shall have no obligation to make any further Contributions on or after such date of termination and Firm shall immediately return to Funder all Contributions that have not been used to pay Operating Expenses prior to the date of such termination;

(B)   the terms and conditions set forth in the following provisions shall survive such termination: Sections 1, 2, 5, 9.3.4, 13, 14, 15, 16, 17.3, and 18; and

(C)   in addition, if the termination is by Funder pursuant to any of Sections 17.2.3, 17.2.4 and/or 17.2.6, additional default interest shall (i) accrue on all Outstanding Principal at the rate of three-quarters of one percent (0.75%) per every thirty (30) days, calculated on a daily basis beginning on the date of such termination, (ii) be payable to Funder in accordance with Section 13.2 and (iii) be compounded with the Outstanding Principal every thirty (30) days.

18.    MISCELLANEOUS

18.1    This Agreement, together with all exhibits hereto, sets forth the entire understanding between the Parties and supersedes all previous understandings, agreements, communications, and representations, whether written or oral, concerning the subject matter to which this Agreement relates. There are no intended third party beneficiaries of this Agreement. None of Funder's Affiliates or agents are in privity with Firm under this Agreement and no such Affiliate or agent has any rights, duties, obligations, or liabilities to Firm under this Agreement. The Parties will not challenge, dispute, or contest the validity, legality, or enforceability of this Agreement in any jurisdiction on any grounds, or aid or assist any other Person in doing so.

18.2    Firm and Funder are independent contractors. Nothing contained in this Agreement shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between Funder, one the one hand, and Firm, any Partner or any other Person on the other hand. Neither Funder nor its employees, members, partners, consultants, contractors or agents are agents, fiduciaries, employees, or joint venturers of Firm, nor do they have any authority to bind Firm by contract or otherwise to any obligation. Neither Firm nor its employees, members, partners, consultants, contractors or agents are agents, fiduciaries, employees, or joint venturers of Funder, nor do they have any authority to bind Funder by contract or otherwise to any obligation. Although each of Funder and Firm retains and/or employs attorneys, neither Funder nor Firm nor their respective attorneys are rendering legal services to the other Party as part of this Agreement or in the performance of any obligations hereunder. Any Party concerned about a legal matter or issue, or the legal effect of any document, including this Agreement or the obligations and transactions contemplated hereunder, will consult with its own legal counsel for advice or opinions on which it may rely.

18.3    In the event of any dispute concerning the interpretation or construction of this Agreement or the exhibits hereto, no presumption shall exist with respect to the Party initially drafting such agreement. The Parties each agree they have had ample opportunity to influence the choice of language and terms in this Agreement and the exhibits hereto and have received advice of their counsel in connection herewith.

18.4    This Agreement and the legal relations between the Parties shall be governed by, construed, and enforced in accordance with the internal laws (and not the conflicts laws) of the State of Delaware.

**EXECUTION COPY**

18.5    Funder would be irreparably damaged if the provisions of this Agreement were not performed in accordance with their specific terms and a breach of this Agreement by Firm or any Partner could not adequately be compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which Funder may be entitled, at law or in equity, Funder shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary, and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

18.6    Any failure of any of the Parties to comply with any obligation, agreement, or condition under this Agreement shall not operate as a waiver of, or estoppel with respect to, any subsequent or other such failure. No failure by a Party to take any action against any breach of this Agreement or default by the other Party shall constitute a waiver of such Party's right to enforce any provision of this Agreement or to take any such action.

18.7    The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any Party shall not preclude or waive the right to use any or all other remedies. Such rights and remedies are given in addition to any other rights the Parties may have by law, statute, ordinance or otherwise.

18.8    Neither Firm nor any Partner may assign or otherwise transfer this Agreement or any of its rights, duties, or obligations hereunder to any third party whether by assignment, merger, consolidation, reorganization, acquisition, change of control, or otherwise, without the prior written consent of Funder. Funder may assign this Agreement including any of its rights, duties or obligations hereunder to an Affiliate of Funder without the consent of Firm or Partners. Any purported assignment made in violation of this Section 18.8 shall be null and void *ab initio*.

18.9    This Agreement is entered into among the Parties for the exclusive benefit of the Parties and their permitted successors and assigns. Each and all of the assignments, licenses, covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the Parties, and their permitted successors and assigns.

18.10   None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of any Party. Except and only to the extent provided by applicable statute, no such creditor shall have any rights under this Agreement.

18.11   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy. Facsimile and email signatures shall be acceptable to render this Agreement binding.

18.12   Any dispute, claim, or controversy arising out of or relating to this Agreement shall be determined by final, binding, and non-appealable arbitration in Wilmington, Delaware, as follows:

18.12.1    any dispute that relates solely to the "fair market value" of any non-monetary transaction or material non-monetary consideration, which remains unresolved for thirty (30) days after Firm or Funder gives notice to the other of such dispute, shall be settled by a single neutral arbitrator agreed to by Firm and Funder; provided, that if Firm and Funder are unable to agree to an arbitrator within twenty (20) days of receiving the list of candidate arbitrators from JAMS, then, within ten (10) days, the organization administering the arbitration shall appoint an arbitrator. Firm and Funder shall submit to the arbitrator and exchange with each other, in accordance with a procedure to be established by the arbitrator, its valuation.

18.12.2    any dispute not subject to Section 18.12.1, shall be settled by an arbitration panel consisting of three (3) neutral arbitrators (the "Panel"). The members of the Panel shall be agreed to by Firm and Funder; provided, that if they are unable to agree to three members within twenty (20) days of receiving the list of candidate members from JAMS, then, within ten (10) days, the organization administering the arbitration shall appoint the number of members needed to supplement the members on which Firm and Funder do agree in order to complete the Panel. The Panel shall provide a written, reasoned opinion with respect to its decision.

18.12.3    any arbitration brought pursuant to either or both of Sections 18.12.1 or 18.12.2, shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the award may be entered in any court having jurisdiction. This clause shall not preclude (i) Firm and Funder from seeking emergency equitable remedies from a court of appropriate jurisdiction, or (ii) Funder from (x) seeking relief pursuant to Section 18.5, or (y) taking any judicial or non-judicial action it deems appropriate to enforce and realize upon its security interest in the Firm Collateral and/or the Partner Collateral, and none of the foregoing relief or action shall be subject to any defense or delayed based upon this Section 18.12. The proceedings, judgment, and all other information related to arbitration initiated pursuant to this Agreement, shall be considered Confidential Information as defined in Section 16.

18.13    This Agreement may be amended only by a written instrument executed by the Party intended to be bound thereby.

18.14    Any public announcement, press release, or similar publicity by any of the Parties with respect to this Agreement or the Claims may only be issued at such time and in such manner as agreed to by both Firm and Funder.

[Remainder of Page Intentionally Left Blank]

**EXECUTION COPY**

    IN WITNESS WHEREOF, this Amended and Restated Law Firm Funding Agreement has been executed by duly authorized representatives of the Parties on the dates below.

**HOSIE RICE LLP**

By: _____

Name: SPENCER HOSIE

Title: PARTNER.

Date: 9/7/18

**FROME WYE LIMITED**

By: _____

Name: TIM DENHAM

Title: DIRECTOR

Date: 10th September 2018

**PARTNERS**

_____

Name: Spencer Hosie

Date: 9/7/18

_____

Name: Diane Rice

Date: 9/7/18

27

EXECUTION COPY

## EXHIBIT A

### CONTINGENCY CASES

*Space Data Corp. v. Google, Inc. et al.*
Case No. 16-cv-03260-BLF (NC)
United States District Court (Northern)
Date filed: June 13, 2016

*Sixense Entertainment, Inc. v. Samsung*
Case not filed yet

*LookSmart Group, Inc. v. Microsoft Corporation*
United States District Court (Northern)
Case No. 3:17-cv-4709
Date filed: August 15, 2017

*MasterObjects, Inc. v. eBay Inc.*
United States District Court (Northern)
Case No. 3:16-cv-06824-SK
Date filed: November 28, 2016

*Carl Weissensee, Jr. and Candice Curtis (Mariner Homes) v. Carol Argentos, Rutan & Tucker LLP, Scott Rogers, Kaveh Badiei, Theodore Klaassen, Keegin Harrison LLP, and Paul C. Smith*
Superior Court of California (Marin)
Case No. CIV-1700432
Date filed: February 3, 2017

*John J. Hagenbuch v. John Fremont Steel, IV et al.*
Superior Court of California (San Diego)
Case No. 37-2016-00022478-CU-NP-CTL
Date filed: July 5, 2016

**EXECUTION COPY**

## EXHIBIT B

### CLOSING NOTICE

[INSERT FIRM INFORMATION]

***VIA E-MAIL ONLY***

Dear [_____]:

Reference is made to the Amended and Restated Law Firm Funding Agreement effective [_____], 201_ (the "Funding Agreement") between [NAME OF FIRM] ("Firm"), the Partners named therein and Frome Wye Limited, incorporated and registered in England and Wales ("Funder"). All capitalized terms used and not defined herein shall have the same meanings ascribed to such terms in the Funding Agreement.

Pursuant to Section 12.1 of the Funding Agreement, Funder hereby notifies Firm of Funder's election to proceed with the Closing. The Closing shall occur on [_____], [_____], 201_, unless an alternative date is agreed upon by the parties (the "Closing Date"). Please prepare all of Firm's Closing deliverables, as set forth in Section 12.2 of the Funding Agreement, in advance of the Closing Date.

Per Section 12.2.3 of the Funding Agreement, please note that Funder's bank account details for payment of the Arrangement Fee are as follows:

[FUNDER TO INSERT BANK ACCOUNT DETAILS]

If you have any questions concerning this Closing Notice, please contact Alex Lempiner via email at alempiner@woodsfordlf.com or 267-467-4082.


Very truly yours,


Addison Group, LLC,
on behalf of
Frome Wye Limited

EXECUTION COPY

# EXHIBIT C

## PRELIMINARY DUE DILIGENCE CHECKLIST

Please provide the information/documentation relating to Firm and the Contingency Cases described in the following checklist.

We appreciate that you may have already provided us with many of these items, so we ask that you please indicate below if you have fully completed each request.  If certain documents or information still needs to be provided, please so indicate and make these materials available for our review as soon as possible.  If documents relevant to a certain request do not exist, please so indicate.

For avoidance of doubt, we do not seek to examine or review any (i) information where it would be in breach of a pre-existing and binding legal obligation (e.g. a protective court order, or client confidentiality) to do so or (ii) Privileged Materials.

This checklist and any information/documentation disclosed in response hereto shall be treated in accordance with the terms of the Amended and Restated Law Firm Funding Agreement between Funder, the Partners named therein and Firm effective _____ __, 201_ (the "Funding Agreement").  Capitalized terms, not otherwise defined herein, shall have the definitions set forth for such terms in the Funding Agreement.

| CATEGORY | REQUEST NO./CODE | INFORMATION/DOCUMENTATION REQUESTED | STATUS |
|---|---|---|---|
| Financial | | Historic financials including: | |
| | F 1.1 | – profit and loss accounts for the last 5 years; | [Outstanding] [Already provided] [Does not exist] |
| | F 1.2 | – year-end balance sheets for the last 5 years; and | [Outstanding] [Already provided] [Does not exist] |
| | F 1.3 | – federal and state tax returns for the last 3 years | [Outstanding] [Already provided] [Does not exist] |

EXECUTION COPY

| Financial | | Current financials including the most recent: | [Outstanding] [Already provided] [Does not exist] |
|---|---|---|---|
| | F 2.1 | – management accounts; and | [Outstanding] [Already provided] [Does not exist] |
| | F 2.2 | – balance sheet | [Outstanding] [Already provided] [Does not exist] |
| Financial | F 3 | Bank statements for the last 12 months | [Outstanding] [Already provided] [Does not exist] |
| Financial | | Aged debtor report to support balance sheet debtors at: | [Outstanding] [Already provided] [Does not exist] |
| | F 4.1 | – the latest balance sheet date; and | [Outstanding] [Already provided] [Does not exist] |
| | F 4.2 | – each of the previous 5 year-end dates | [Outstanding] [Already provided] [Does not exist] |
| Financial | | Details of all existing bank/other debt facilities and all capital lease obligations, including: | [Outstanding] [Already provided] [Does not exist] |
| | F 5.1 | – list of all such arrangements; | [Outstanding] [Already provided] [Does not exist] |
| | F 5.2 | – details of any security given; and | [Outstanding] [Already |

**EXECUTION COPY**

| | | | |
|---|---|---|---|
| | | | provided]<br>[Does not exist] |
| | F 5.3 | – copies of agreements and security documentation | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| Financial | F 6 | Cash-flow forecast for the next two years | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| Operations | O 1 | Breakdown of current staff numbers – how many partners, attorneys, non-attorneys etc. | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| Operations | O 2 | Any plans to amend staffing – for example if a funding facility is available, would additional attorneys be hired? | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| Operations | O 3 | Management organizational chart, including the title of all officers and a description of the Firm's financial management.  Who is tasked with managing the accounts, tax returns, payments etc? | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| Cases | | For each ongoing contingent fee case: | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| | C 1.1 | – Case name (and docket number if filed) | [Outstanding]<br>[Already provided]<br>[Does not exist] |
| | C 1.2 | – Description of the claim<br>(Are there any obvious counterclaims and/or defences?)<br>(Have there been any waivers, releases, settlements or other agreements affecting rights related to the claim?) | [Outstanding]<br>[Already provided]<br>[Does not exist] |

**EXECUTION COPY**

| | | | |
|---|---|---|---|
| C 1.3 | – | Filing status (i.e. has case been filed? If not, when?) | [Outstanding] [Already provided] [Does not exist] |
| C 1.4 | – | How long will take to (i) first instance judgment, (ii) appeal, (iii) ultimate recovery (and what are the key milestone dates - e.g. Markman, IPR, trial dates)? | [Outstanding] [Already provided] [Does not exist] |
| C 1.5 | – | Firm's retainer agreement | [Outstanding] [Already provided] [Does not exist] |
| C 1.6 | – | Case budget, including expected case disbursements. (How much of that cost is sought from Funder, and who else will contribute?) | [Outstanding] [Already provided] [Does not exist] |
| C 1.7 | – | Identity of the claimant(s) | [Outstanding] [Already provided] [Does not exist] |
| C 1.8 | – | Identity of the defendant(s) | [Outstanding] [Already provided] [Does not exist] |
| C 1.9 | – | Jurisdiction (which court/tribunal will decide the claim) | [Outstanding] [Already provided] [Does not exist] |
| C 1.10 | – | Details of any co-counsel and their remuneration | [Outstanding] [Already provided] [Does not exist] |
| C 1.11 | – | Details of any parties that have an interest in the claim (economic and/or lien) | [Outstanding] [Already provided] [Does not exist] |

EXECUTION COPY

| | | | |
|---|---|---|---|
| | C 1.12 | – Where and how will any judgment/award be enforced (and who will pay for the costs of enforcement)? | [Outstanding] [Already provided] [Does not exist] |
| Cases | | For each closed contingent fee case in the last 3 years: Note: if any risk of confidentiality breaches, then cases may be anonymised | [Outstanding] [Already provided] [Does not exist] |
| | C 2.1 | – Case name (and docket number if filed) | [Outstanding] [Already provided] [Does not exist] |
| | C 2.2 | – Description of the claim | [Outstanding] [Already provided] [Does not exist] |
| | C 2.4 | – Case type (e.g. patent, class action etc.) | [Outstanding] [Already provided] [Does not exist] |
| | C 2.5 | – Key milestone dates (e.g. Markman, IPR, trial dates) | [Outstanding] [Already provided] [Does not exist] |
| | C 2.6 | – Gross recovery (if any) (Did the actual gross recovery materially change from the initially estimated claim value and, if so, why?) | [Outstanding] [Already provided] [Does not exist] |
| | C 2.7 | – Timeline (Did the actual timeline materially change from the initial estimate and, if so, why?) | [Outstanding] [Already provided] [Does not exist] |
| | C 2.8 | – Jurisdiction (which court/tribunal heard the claim) | [Outstanding] [Already provided] [Does not exist] |

EXECUTION COPY

| | C 2.9 | – Outcome | [Outstanding] [Already provided] [Does not exist] |
|---|---|---|---|
| | C 2.10 | – Fee earned (if any) by the firm | [Outstanding] [Already provided] [Does not exist] |
| | C 2.11 | – Principal partners/associates involved and their role(s) | [Outstanding] [Already provided] [Does not exist] |
| Legal | L 1 | Copy of the Partnership or Shareholder Agreement and corporate structure chart (if applicable) | [Outstanding] [Already provided] [Does not exist] |
| | L 2 | Is the Firm involved in any litigation, arbitration or administrative proceeding and is any threatened or pending? | [Outstanding] [Already provided] [Does not exist] |

**EXECUTION COPY**

## EXHIBIT D

## [NAME OF FIRM]

### PARTNER'S CERTIFICATE

I, the undersigned partner of [NAME OF FIRM] ("**Firm**"), pursuant to Section 12.2.2 of that certain Amended and Restated Law Firm Funding Agreement, by and between Firm, the Partners named therein and Frome Wye Limited ("**Funder**"), dated _____, 201_ (the "**Agreement**"), the terms of which are hereby incorporated and made part hereof by reference, do hereby certify that:

1.      The representations and warranties contained in Section 10.1 of the Agreement were true and correct in all material respects as of the date of the Agreement and are true and correct in all material respects as of the date hereof, as if made on the date hereof.

2.      Firm has performed and complied with all covenants and obligations contained in the Agreement which are required to be performed or complied with by Firm at or prior to the Closing in all material respects.

3.      Firm has provided Funder with access to all Related Materials as described in Section 3 of the Agreement.

4.      The undersigned is a partner of Firm and is authorized to execute and deliver this Certificate on behalf of Firm.

5.      Firm has taken all necessary and appropriate action to authorize the execution and delivery of the Agreement and Firm's agreement to be bound thereby.

Capitalized terms used but not otherwise defined herein, shall have the meanings given such terms in the Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand this _____, 201_.

By: _____

Name: _____

Title: Partner

**EXECUTION COPY**

## EXHIBIT E

## FROME WYE LIMITED

### DIRECTOR'S CERTIFICATE

I, the undersigned Director of Frome Wye Limited, incorporated and registered in England and Wales (the "**Funder**"), pursuant to Section 12.3.2 of that certain Amended and Restated Law Firm Funding Agreement, by and between Funder, [NAME OF FIRM] and the Partners named therein, dated _____ ___, 201_ (the "**Agreement**"), the terms of which are hereby incorporated and made part hereof by reference, do hereby certify that:

1.      The representations and warranties contained in Section 10.2 of the Agreement were true and correct in all material respects as of the date of the Agreement and are true and correct in all material respects as of the date hereof, as if made on the date hereof.

2.      Funder has performed and complied with all covenants and obligations contained in the Agreement which are required to be performed or complied with by Funder at or prior to the Closing in all material respects.

3.      The undersigned is the duly elected Director of Funder and is authorized to execute and deliver this Certificate on behalf of Funder.

4.      Funder has taken all necessary and appropriate action to authorize the execution and delivery of the Agreement and Funder's agreement to be bound thereby.

Capitalized terms used but not otherwise defined herein, shall have the meanings given such terms in the Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand this _____, 201_.

By: _____

Name: _____

Title: Director

EXECUTION COPY

## EXHIBIT F

### Collateral Account Details

Hosie Rice LLP Operating Account
Presidio Bank
1 Montgomery Street, Suite 2300
San Francisco, CA 94111
Routing No. 121044356
Acct. No. 1101002085

# Exhibit B

**RECORDING REQUESTED BY**
Mid Valley Title and Escrow Company
Foreclosure No. 6334790GW
Order No.
Loan No.

**WHEN RECORDED MAIL TO:**
Mid Valley Title and Escrow Company
Attention: Greg Wood
601 Main Street
Chico, California 95928
APN#060-202-13

**2020-0037612**

| | |
|---|---|
| Recorded | REC FEE 20.00 |
| Official Records | |
| County of | SB2 HOUSING 75.00 |
| Marin | DA FRAUD FEE 10.00 |
| SHELLY SCOTT | |
| Assessor-Recorder | |
| County Clerk | |
| | MM |
| 09:59AM 19-Aug-2020 | Page 1 of 3 |

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# NOTICE OF DEFAULT

## (COVER SHEET)

**Trustor: Spencer Hosie and Diane S. Rice (together, Trustor)**
**Assessors Number: 060-202-13**
**Property address: 331 Golden Gate Avenue**
    **Belvedere Tiburon, CA 94920**

NOD.DOC (11/94)

**RECORDING REQUESTED BY**
Mid Valley Title and Escrow Company
Foreclosure No. 6334790GW
Order No.
Loan No.

**WHEN RECORDED MAIL TO:**
Mid Valley Title and Escrow Company
**Attention: Greg Wood**
601 Main Street
Chico, California 95928
APN#060-202-13

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# NOTICE OF DEFAULT

**NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED**
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST; IMPORTANT NOTICE: YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU HAVE FAILED TO MAKE PAYMENTS AS REQUIRED BY THE AMENDED AND RESTATED LAW FIRM FUNDING AGREEMENT DATED SEPTEMBER 10, 2018 (THE "FUNDING AGREEMENT") AMONG YOU, HOSIE RICE LLP AND FROME WYE LIMITED AND YOU ARE IN BREACH OF THE FUNDING AGREEMENT. YOUR PROPERTY MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).  This amount is $1,156,723.48 as of August 18, 2020 and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by the Funding Agreement and deed of trust or mortgage.  If you fail to make future payments as required by the Funding Agreement, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the Funding Agreement and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

NOD.DOC (11/94)

Foreclosure #6334790GW

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

Mid Valley Title and Escrow Company

601 Main Street

Chico, CA 95928

(530) 893-5644

If you have any questions, you should contact a lawyer.

Remember, YOU MAY LOSE YOUR LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

## NOTICE OF DEFAULT

NOTICE IS HEREBY GIVEN: That Mid Valley Title and Escrow Company, a corporation, is duly appointed Trustee under a Deed of Trust dated October 10, 2018 executed by Spencer Hosie and Diane S. Rice (together, Trustor), in favor of Frome Wye Limited (Beneficiary), recorded October 11, 2018, as Instrument #2018-0035545, of Official Records in the Office of the Marin County Recorder securing all obligations owed by Trustor under the Amended and Restated Law Firm Funding Agreement dated September 10, 2018 (the Funding Agreement) among Trustor, Hosie Rice LLP and Beneficiary, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that Trustor defaulted under the Funding Agreement by not paying the amounts owed under Section 13 of the Funding Agreement, the present beneficiary under such Deed of Trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee, such Deed of Trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: August 18, 2020

Mid Valley Title and Escrow Company, a corporation, as trustee

Greg Wood, Foreclosure Officer

# Exhibit C

2023-0027399

| Recorded | REC FEE | 23.00 |
| Official Records | | |
| County of | SB2 HOUSING | 75.00 |
| Marin | DA FRAUD FEE | 10.00 |
| SHELLY SCOTT | | |
| Assessor-Recorder | | |
| County Clerk | JM | |
| 01:15PM 18-Oct-2023 | Page 1 of 4 | |

RECORDING REQUESTED BY

*ORANGE COAST title*

AND WHEN RECORDED MAIL TO

Assured Lender Services, Inc.
111 Pacifica
Suite 140
Irvine, CA 92618

Space above this line for recorder's use only

Trustee Sale No. F21-00052    Loan No. Hosie    Title Order No. 2296666-05

## NOTICE OF TRUSTEE'S SALE

**NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED**
**注：本文件包含一个信息摘要**
**참고사항: 본 첨부 문서에 정보 요약서가 있습니다**
**NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO**
**TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP**
**LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY**

**PURSUANT TO CIVIL CODE 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO ABOVE IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.**

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, ASSIGNMENT OF RENTS AND REQUEST FOR SPECIAL NOTICE UNDER CALIFORNIA CIVIL CODE SECTION 2924B DATED 08/01/2009 AND MORE FULLY DESCRIBED BELOW (THE "DEED OF TRUST"). UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash or cashiers check (payable at the time of sale in lawful money of the United States) (payable to Assured Lender Services, Inc.), will be held by a duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest thereon, as provided in the note(s), advances, under the terms of the Deed of Trust and costs, charges and expenses of the undersigned trustee ("Trustee") for the total amount (at the time of the initial publication of this Notice of Trustee's Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Trustor(s):    **Spencer Hosie and Diane Rice, husband and wife, collectively**

Recorded:    **recorded on 08/25/2009 as Document No. 2009-0049326** of Official Records in the office of the Recorder of **Marin** County, California;

Date of Sale:    **11/16/2023 at 09:30AM**

Place of Sale:    **Outside at the Southwest corner of San Rafael City Hall, located at 1400 Fifth Avenue, San Rafael, CA 94901**

Amount of unpaid balance and other charges: **$1,905,031.27**

The purported property address is:    **331 Golden Gate Avenue, Belvedere, CA 94920**

090010.0183\32865856.1

Trustee Sale No. F21-00052
Loan No. Hosie
Title Order No. 2296666-05

Legal Description          **See Exhibit "A" attached hereto and made a part hereof**
Assessors Parcel No.       **060-202-13**

The beneficiary under the Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell Under Deed of Trust, Assignment of Rents and Request For Special Notice under California Civil Code Section 2924b (the "Notice of Default and Election to Sell"). The undersigned caused the Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Trustee's Sale.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to **Section 2924g of the California Civil Code**. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this property, you may call **(877)440-4460** or visit this internet web-site **www.mkconsultantsinc.com,** using the file number assigned to this case **F21-00052**. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet web-site. The best way to verify postponement information is to attend the scheduled sale.

**NOTICE TO TENANT:** You may have a right to purchase this property after the trustee auction, if conducted after January 1, 2021, pursuant to Section 2924m of the California Civil Code. If you are an "eligible tenant buyer" you can purchase the property if you match the last and highest bid placed at the trustee auction. If you are an "eligible bidder," you may be able to purchase the property if you exceed the last and highest bid placed at the trustee auction. There are three steps to exercising this right of purchase. First, 48 hours after the date of the trustee sale, you can call **(877)440-4460** or visit this internet website site **www.mkconsultantsinc.com,** using the file number assigned to this case **F21-00052** to find the date on which the trustee's sale was held, the amount of the last and highest bid, and the address of the trustee. Second, you must send a written notice of intent to place a bid so that the trustee receives it no more than 15 days after the trustee's sale. Third, you must submit a bid, by remitting the funds and affidavit described in Section 2924m(c) of the Civil Code, so that the trustee receives it no more than 45 days after the trustee's sale. If you think you may qualify as an "eligible tenant buyer" or "eligible bidder," you should consider contacting an attorney or appropriate real estate professional immediately for advice regarding this potential right to purchase.\*

**NOTICE TO POTENTIAL BIDDERS: WE REQUIRE CERTIFIED FUNDS AT SALE BY CASHIER'S CHECK(S) PAYABLE DIRECTLY TO "ASSURED LENDER SERVICES, INC." TO AVOID DELAYS IN ISSUING THE FINAL DEED.**

090010.0183\32865856.1

Trustee Sale No. F21-00052
Loan No. Hosie
Title Order No. 2296666-05

DATE: 10/18/2023

Assured Lender Services, Inc.

*Cherie Maples*

Cherie Maples, Vice President of Trustee Operations
Assured Lender Services, Inc.
111 Pacifica
Suite 140
Irvine, CA 92618
Phone: (714) 508-7373

**Sales Line:  (877)440-4460**
**Sales Website: www.mkconsultantsinc.com**
Reinstatement Line: (714) 508-7373
To request reinstatement and/or payoff FAX request to: (714) 505-3831

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE
USED FOR THAT PURPOSE.**

090010.0183\32865856.1

Trustee Sale No. F21-00052
Loan No. Hosie
Title Order No. 2296666-05

## Exhibit "A"
## Legal Description

The land referred to is situated in the County of Marin, City of Belvedere, State of California, as is described as follows:

Parcel One:

Parcel One, as shown upon that certain Parcel Map entitled "Parcel Map of Division of Lots 2 & 3, Block 49 and a Portion of Belvedere Ave., Map #4 of Belvedere Peninsula (Rack 1 Pull 11), Belvedere", filed for record January 23, 1974 in Book 9 of Parcel Maps, at Page 61, Marin County Records.

Parcel Two:

Easement for sewer and utility purposes, 10 feet in width, appurtenant to Parcel One above described, lying Northwesterly of and contiguous to the following described line:

Beginning at a point in the Southeasterly line of Lot 2, Block 49, as shown upon that certain map entitled, "Map No. 4 of Belvedere Peninsula, filed for record August 12, 1895 in Rack 1, Pull 11, Marin County Records, which point bears South 44° 44' West 154.68 feet to the most Easterly corner of the aforesaid Lot 2; running thence from said point of beginning along said lot line and its extension Southwesterly, South 44° 44' West 100 feet to a point in the Northeasterly line of Belvedere Ave., as realigned on that certain map entitled, "Map of Resubdivision of portions of the City of Belvedere", filed for record February 20, 1937 in Volume 5 of Maps, at Page 69, Marin County Records.

090010.0183\32865856.1

# Exhibit D



LUBIN OLSON & NIEWIADOMSKI LLP
THE TRANSAMERICA PYRAMID
600 MONTGOMERY STREET, 14TH FLOOR   SAN FRANCISCO, CALIFORNIA 94111
TEL 415 981 0550   FAX 415 981 4343   WEB lubinolson.com

November 22, 2023

MIA S. BLACKLER
Direct Dial: (415) 955-5012
Email: mblackler@lubinolson.com

**VIA EMAIL AND OVERNIGHT DELIVERY**
donnad@fnf.com

Fidelity National Title Company
Attn:  Donna DiBasilio
707 Tamalpais Dr., #306
Corte Madera, CA  94925

Re:  *Demand for Payment and Release Price from Frome Wye Limited re its Deed of Trust against 331 Golden Gate Avenue, Belvedere, California*

Dear Ms. DiBasilio:

This office is retained to represent Frome Wye Limited ("Frome Wye"), a secured creditor with a perfected deed of trust lien recorded against that certain real property commonly described as 331 Golden Gate Ave. in Belvedere, California (the "Property").  The Property is owned by Spencer Hosie and Diane Rice.  We are informed that your office is handling the escrow of the potential sale of the Property.

Title records confirm that Frome Wye holds a third lien position deed of trust secured against the Property (the "Deed of Trust").  The Deed of Trust was perfected when it recorded against the Property on October 11, 2018. (See enclosed Deed of Trust and Trustee's Sale Guarantee).

The First Republic/Chase Bank and Perkins Coie deed of trust liens are senior to the Deed of Trust.  ***But Frome Wye's Deed of Trust lien is senior to state and federal tax liens that recorded against the Property as follows***:

A.  As to the California Franchise Tax Board's lien, the Deed of Trust recorded first in time; and

B.  As to the IRS tax lien, (1) the Deed of Trust recorded first in time, and (2) the Notice of Federal Tax Lien (NFTL) did not record against the Property until January 2020.  Because the NFTL was not filed prior to Frome Wye perfecting its security interest when it recorded the Deed of Trust, Frome Wye has priority over the tax lien pursuant to Internal Revenue Code section 6323 and 26 C.F.R. § 301.6323(h)-1.  This is true even if the

Fidelity National Title Company
Attn: Donna DiBasilio
November 22, 2023
Page 2

taxpayers/sellers failed to pay their Federal income taxes to the IRS prior to the recordation of the Deed of Trust.[1]

     After closing costs, any outstanding Marin County property taxes, and payment of the First Republic/Chase and Perkins Coie liens, Frome Wye's lien must be paid through the remaining sale proceeds and <u>before</u> satisfaction of either of the California or IRS tax liens as set forth above.

     The principal owing to Frome Wye is $1,817,000. Although Frome Wye is owed additional sums, it is willing to accept the sum of $1,817,000 as a release price only for the purposes of the pending sale of the Property. Upon receipt and negotiation of the anticipated $1,817,000 from the sale proceeds of the Property, Frome Wye will reconvey its Deed of Trust.

     Frome Wye's SWIFT instructions for receipt of payment are below:

Account name
FROME WYE LIMITED
BIC
NWBKGB2L
IBAN
GB82NWBK60730142191203
Account number
140/01/42191203
Branch name
CITY OF LONDON OFF

     Please be sure to keep us apprised of the sale closing status, and do not hesitate to let me know if you need any further information or documentation.

                  Very truly yours,

                  Mia S. Blackler

Enclosures

---

[1] See Section 5.17.2.6.4 of Chapter 17 of the IRS' Legal Reference Guide for Revenue Officers on its website at subsection (1), concerning the priority of a perfected security interest holder as against a federal tax lien. https://www.irs.gov/irm/part5/irm_05-017-002

Fidelity National Title Company
Attn:  Donna DiBasilio
November 22, 2023
Page 3


cc:     Internal Revenue Service (VIA OVERNIGHT MAIL W/ ENCLS.)
        Attn:  Jennifer D. Tarble
        4330 Watt Ave., SA-5051
        Sacramento, CA 95821-7012

        California Franchise Tax Board (VIA USPS PRIORITY MAIL)
        P.O. Box 942857
        Sacramento, California  94257-0500

        Tracy McLaughlin (VIA EMAIL AND OVERNIGHT MAIL W/ENCLS.)
        285 Magnolia Ave.
        Larkspur, CA  94939

**RECORDING REQUESTED BY:**
First American Title Company

**AND WHEN RECORDED MAIL DOCUMENT TO:**
FROME WYE LIMITED, incorporated and registered
in England and Wales
1180 Welsh Road
North Wales, PA 19454

Recorders Serial No. 2018-00 35545

Recorded 10 / 11 / 18 @ 11:54 M
　　　　　　Mo.　Day　Year

Certified to be a true and correct copy
of the original.
FIRST AMERICAN TITLE COMPANY
of Marin

BY _____

*Space Above This Line for Recorder's Use Only*

A.P.N.: 060-202-13　　　　　　　　　　　　　　File No.: 2102-5768315 (LM)

## DEED OF TRUST WITH ASSIGNMENT OF RENTS
### (LONG FORM)

THIS DEED OF TRUST, made this _____10|10|18_____, between

TRUSTOR: **Spencer Hosie and Diane S. Rice, husband and wife**

whose address is **331 Golden Gate Avenue, Belvedere, CA 94920,**

TRUSTEE: **First American Title Insurance Company, a Nebraska Corporation**

and BENEFICIARY: **FROME WYE LIMITED, incorporated and registered in England and Wales**

WITNESSETH: That Trustor irrevocably grants to Trustee in trust, with power of sale, that property in the City of Belvedere, County of Marin, State of California, described as:

**PARCEL ONE:**

**PARCEL 1, AS SHOWN UPON THAT CERTAIN PARCEL MAP ENTITLED, "PARCEL MAP OF DIVISION OF LOTS 2 & 3, BLOCK 49 AND A PORTION OF BELVEDERE AVE., MAP #4 OF BELVEDERE PENINSULA (RACK 1 PULL 11), BELVEDERE", FILED FOR RECORD JANUARY 23, 1974 IN VOLUME 9 OF PARCEL MAPS, AT PAGE 61, MARIN COUNTY RECORDS.**

**PARCEL TWO:**

**EASEMENT FOR SEWER AND UTILITY PURPOSES, 10 FEET IN WIDTH, APPURTENANT TO PARCEL ONE ABOVE DESCRIBED, LYING NORTHWESTERLY OF AND CONTIGUOUS TO THE FOLLOWING DESCRIBED LINE:**

**BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF LOT 2, BLOCK 49, AS SHOWN UPON THAT CERTAIN MAP ENTITLED, "MAP NO. 4 OF BELVEDERE PENINSULA", FILED FOR RECORD AUGUST 12, 1895 IN RACK 1, PULL 11, MARIN COUNTY RECORDS, WHICH POINT BEARS SOUTH 44° 44' WEST 154.68 FEET TO THE MOST EASTERLY CORNER OF THE AFORESAID LOT 2; RUNNING THENCE FROM SAID POINT OF BEGINNING ALONG SAID LOT LINE AND ITS EXTENSION SOUTHWESTERLY SOUTH 44° 44' WEST 100 FEET TO A POINT IN THE NORTHEASTERLY LINE OF BELVEDERE AVE., AS REALIGNED ON THAT CERTAIN MAP ENTITLED, "MAP OF RESUBDIVISION OF PORTIONS OF THE CITY OF BELVEDERE", FILED**

(Continued on Page 2)

**FOR RECORD FEBRUARY 20, 1937 IN VOLUME 5 OF MAPS, AT PAGE 68, MARIN COUNTY RECORDS.**

together with rents, issues and profits thereof, subject, however, to the right, power and authority hereinafter given to and conferred upon Beneficiary to collect and apply such rents, issues and profits for the purpose of securing (1) payment of the sum of $********* with interest thereon according to the terms of a promissory note or notes of even date herewith made by Trustor, payable to order of Beneficiary, and extensions or renewals thereof, (2) the performance of each agreement of Trustor incorporated by reference or contained herein and (3) payment of additional sums and interest thereon which may hereafter be loaned to Trustor, or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust.

*****"all amounts to satisfy Trustor's obligations under Section 13.3 of that certain Amended and Restated Law Firm Funding Agreement dated as of September 10, 2018, by and between Hosie Rice LLP, Trustor and Beneficiary ("Funding Agreement") which provides a Committed Amount of financing to Hosie Rice LLP up to $2,000,000, as more particularly set forth in said Funding Agreement. Wherever in this Deed of Trust reference is made to "a promissory note or notes" or similar terms, such reference shall mean only Trustor's obligations under the Funding Agreement."

A.  To protect the security of this Deed of Trust, Trustor agrees:

1)  To keep said property in good condition and repair, not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefore, to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon, not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general.

2)  To provide, maintain and deliver to Beneficiary fire insurance satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

3)  To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this Deed.

4)  To pay, at least ten days before delinquency all taxes and assessments affecting said property, including assessments on appurtenant water stock; when due, all encumbrances, charges and liens, with interest, on said property or any part thereof, which appear to be prior or superior hereto; all cost, fees and expenses of this Trust.

Should Trustor fail to make any payment or to do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may: make or do the same in such manner and to such extent as either may deem necessary to protect the security hereof, Beneficiary or Trustee being authorized to enter upon said property for such purposes; appear in and defend any action purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior or superior hereto; and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

(Continued on Page 3)

and, in exercising any such powers, pay necessary expenses, employ counsel and pay his reasonable fees.

   5)  To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the amount allowed by law in effect at the date hereof, and to pay for any statement provided for by law in effect at the date hereof regarding the obligation secured hereby any amount demanded by the Beneficiary not to exceed the maximum allowed by law at the time when said statement is demanded.

B.  It is mutually agreed:

   1)  That any award in connection with any condemnation for public use of or injury to said property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such moneys received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

   2)  That by accepting payment of any sum secured hereby after its due date, Beneficiary does not waive his right either to require payment when due of all other sums so secured or to declare default for failure so to pay.

   3)  That at any time or from time to time, without liability therefore and without notice, upon written request of Beneficiary and presentation of this Deed and said note for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby, Trustee may: reconvey any part of said property; consent to the making of any map or plat thereof; join in granting any easements thereon, or join in any extension agreement or any agreement subordinating the lien or charge hereof.

   4)  That upon written request of Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed and said note to Trustee for cancellation and retention or other disposition as Trustee in its sole discretion may choose and upon payment of its fees, Trustee shall reconvey, without warranty, the property then held hereunder. The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. The Grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

   5)  That as additional security, Trustor hereby gives to and confers upon Beneficiary the right, power and authority, during the continuance of these Trusts, to collect the rents, issues and profits of said property, reserving unto Trustor the right, prior to any default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, to collect and retain such rents, issues and profits as they become due and payable. Upon any such default, Beneficiary may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness hereby secured, enter upon and take possession of said property or any part thereof, in his own name sue for or otherwise collect such rents, issues, and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. The entering upon and taking possession of said property, the collecting of such rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

   6)  That upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, Beneficiary may declare all sums secured hereby immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold said property, which notice shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed, said note and all documents evidencing expenditures secured hereby.

(Continued on Page 4)

After the lapse of such time as may then be required by law following the recordation of said notice of default, and notice of said having been given as then required by law, Trustee, without demand on Trustor, shall sell said property at the time and place fixed by it in said notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for case in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of said property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to such purchaser its deed conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee, or Beneficiary as hereinafter defined, may purchase at such sale.

After deducting all costs, fees and expenses of trustee and of this Trust, including costs of evidence of title in connection with sale, Trustee shall apply to proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

7) Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this Deed is recorded and the name and address of the new Trustee.

8) That this Deed applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including pledgees, of the note secured hereby, whether or not named as Beneficiary herein. In this Deed, whenever the context so requires the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

9) That Trustee accepts this Trust when this Deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other Deed of Trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

10) Trustor requests that copies of the notice of default and notice of sale be sent to Trustor's address as shown above.

Beneficiary requests that copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to Beneficiary's address, as set forth on page one of this Deed of Trust, as provided by Section 2924(b) of the California Civil Code.

If the Trustor shall sell, convey or alienate said property, or any part thereof, or any interest therein, or shall be divested of his title or any interest therein in any manner or way, whether voluntarily or involuntarily, without the written consent of the Beneficiary being first had and obtained, Beneficiary shall have the right, at its option, except as prohibited by law, to declare any indebtedness or obligations secured hereby, irrespective of the maturity date specified in any Note evidencing the same, immediately due and payable.

_____                    _____
Spencer Hosie                                Diane S. Rice

(Continued on Page 5)

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

STATE OF _California_ )SS

COUNTY OF _Marin_ )

On _October 10, 2018_ before me, _Britt Rosenmayr_ , Notary Public, personally appeared
_Spencer Hosie and Diane S. Rice_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.                                    *This area for official notarial seal.*

Notary Signature

BRITT ROSENMAYR
Notary Public - California
Marin County
Commission # 2154978
My Comm. Expires Jun 24, 2020

(Continued on Page 6)

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )SS

COUNTY OF _____ )

On _____ before me, _____ , Notary Public, personally appeared

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*This area for official notarial seal.*

_____

Notary Signature

(Continued on Page 7)

------------------------------------------------------DO NOT RECORD------------------------------------------------------

## REQUEST FOR FULL RECONVEYANCE
*To be used only when note has been paid.*

To: First American Title Insurance Company, a Nebraska Corporation , **Trustee**        Dated:_____

The undersigned is the legal owner and holder of all indebtedness secured by the within Deed of Trust. All sums secured by said Deed of Trust have been fully paid and satisfied; and you are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel all evidences of indebtedness, secured by said Deed of Trust, delivered to you herewith together with said Deed of Trust, to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, the estate now held by you under the same.

Mail Reconveyance to:        _____

_____        _____

_____

_____        By_____

_____        By_____

**NOTE:  Signatures on this Request for Full Reconveyance must be notarized.**

**Do not lose or destroy this Deed of Trust OR THE NOTE which it secures.
Both must be delivered to the Trustee for cancellation before reconveyance will be made.**

# First American Title Insurance Company

MORTGAGE SOLUTIONS DIVISION
3 FIRST AMERICAN WAY, SANTA ANA, CA 92707

**AUGUST 21, 2020**

**MID VALLEY TITLE AND ESCROW**
**601 MAIN STREET P.O. BOX 3039**
**CHICO, CA 95928**
**ATTN: GREG WOOD**

REFERENCE: **6334790/HOSIE**
OUR ORDER NUMBER: **8766520**

THE ITEMS ENCLOSED WERE PREPARED FOR THE SOLE USE OF THE HEREIN-NAMED TRUSTEE. THESE ITEMS SHOULD NOT BE RELIED UPON BY ANY THIRD PARTY AS A CONDITION OF TITLE.

**First American Title Insurance Company**
**Mortgage Solutions Division**

MARIE CRUZ CHRIS RUIZ
TITLE OFFICER(s)
PH:
FX:

ENCLOSURE

| First American Title™ | **CLTA Form No. 22 Trustee's Sale Guarantee** |
|---|---|
| | ISSUED BY |
| | **First American Title Insurance Company** |
| **Guarantee** | GUARANTEE NUMBER |
| | **5030200-8766520** |
| Form 5030200 (2-16-17) | CLTA Guarantee Form No. 22 – Trustee's Sale Guarantee (Rev 11-4-16) |

## TRUSTEE'S SALE GUARANTEE

**SUBJECT TO THE EXCLUSIONS FROM COVERAGE AND THE CONDITIONS ATTACHED HERETO AND MADE A PART OF THIS GUARANTEE,**

**FIRST AMERICAN TITLE INSURANCE COMPANY**
a Nebraska corporation, herein called the Company

**GUARANTEES**

the Assured named in Schedule A of this Guarantee

against loss or damage not exceeding the liability amount stated in Schedule A sustained by the Assured by reason of any incorrectness in the assurances set forth in Paragraph 3 of Schedule A.

## EXCLUSIONS FROM COVERAGE

1. Except to the extent of the assurances set forth in Paragraph 3 of Schedule A, the Company assumes no liability for loss or damage by reason of any law, ordinance, governmental regulation or any other police power adopted or promulgated by any federal or state government authority purporting to regulate nonjudicial foreclosures or any related duties, whether or not disclosed by the Public Records at the Date of Guarantee.
2. Notwithstanding any assurances set forth in Paragraph 3 of Schedule A, the Company assumes no liability for loss or damage by reason of the following:
   a. Defects, liens, encumbrances, adverse claims or other matters affecting the title to any property beyond the lines of the Land expressly described in the description set forth in Schedule A of this Guarantee, or title to streets, roads, avenues, lanes, ways or waterways to which such Land abuts, or the right to maintain therein vaults, tunnels, ramps or any structure or improvements; or any rights or easements therein, unless such property, rights or easements are expressly and specifically set forth in said description.
   b. Defects, liens, encumbrances, adverse claims or other matters, whether or not shown by the Public Records (1) that are created, suffered, assumed or agreed to by one or more of the Assureds; (2) that result in no loss to the Assured; or (3) that do not result either in the invalidity of any nonjudicial proceeding to foreclose the lien of the Mortgage or the failure of any such nonjudicial foreclosure proceeding to divest a lien, estate or interest subordinate or subject to the lien of the Mortgage.
   c. Defects, liens, encumbrances, adverse claims or other matters against the title, not shown by the Public Records.
   d. The identity of any party shown or referred to in Schedule A.
   e. The validity, legal effect or priority of any matter shown or referred to in this Guarantee.
   f. Any law, ordinance, governmental regulation or any other police power adopted or promulgated by any county, city, or any other local government authority purporting to regulate nonjudicial foreclosures or any related duties, whether or not disclosed by the Public Records at the Date of Guarantee.
   g. (1) Taxes or assessments of any taxing authority that levies taxes or assessments on real property; or, (2) proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not the matters excluded under (1) or (2) are shown by the records of the taxing authority or by the Public Records.
   h. (1) Unpatented mining claims; (2) reservations or exceptions in patents or in Acts authorizing the issuance thereof: (3) water rights, claims or title to water, whether or not the matters excluded under (1), (2) or (3) are shown by the Public Records.

In Witness Whereof, First American Title Insurance Company has caused its corporate name to be hereunto affixed by its authorized officers as of Date of Guarantee shown in Schedule A.

*First American Title Insurance Company*

Dennis J. Gilmore, President

Greg L. Smith, Secretary

**If this jacket was created electronically, it constitutes an Original Document.**

© California Land Title Association. All rights reserved.
The use of this Form is restricted to CLTA subscribers in good standing as of the date of use. All other uses are prohibited.
Reprinted under license or express permission from the California Land Title Association.

## TRUSTEE'S SALE GUARANTEE CONDITIONS

1. **Definition of Terms.**
   The following terms when used in the Guarantee mean:
   a. the "Assured": (i) the party or parties named as the Assured in Schedule A, or on a supplemental writing executed by the Company, (ii) the duly substituted trustee of the Mortgage and (iii) the owner of the indebtedness or other obligation secured by the Mortgage.
   b. "Land": the Land described or referred to in Schedule A, and improvements affixed thereto which by law constitute real property. The term "Land" does not include any property beyond the lines of the area described or referred to in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways.
   c. "Mortgage": the mortgage, deed of trust, trust deed, or other security instrument set forth in Paragraph 3.d. of Schedule A.
   d. "Public Records": those records established under California statutes at Date of Guarantee for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge.
   e. "Date of Guarantee": the Date of Guarantee set forth in Schedule A

2. **Notice of Claim to be Given by Assured.**
   The Assured shall notify the Company promptly in writing in case knowledge shall come to the Assured of any assertion of facts, or claims of title or interest that are contrary to the assurances set forth in Paragraph 3 of Schedule A and that might cause loss or damage for which the Company may be liable under this Guarantee. If prompt notice shall not be given to the Company, then all liability of the Company shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of the Assured under this Guarantee unless the Company shall be prejudiced by the failure and then only to the extent of the prejudice.

3. **No Duty to Defend or Prosecute.**
   The Company shall have no duty to defend or prosecute any action or proceeding to which the Assured is a party, notwithstanding the nature of any allegation in such action or proceeding.

4. **Company's Option to Defend or Prosecute Actions; Duty of Assured to Cooperate.**
   Even though the Company has no duty to defend or prosecute as set forth in Paragraph 3 above:
   a. The Company shall have the right, at its sole option and cost, to institute and prosecute any action or proceeding, interpose a defense, as limited in Paragraph 4.b. or to do any other act which in its opinion may be necessary or desirable to establish the correctness of the assurances set forth in Paragraph 3 of Schedule A or to prevent or reduce loss or damage to the Assured including, but not limited to, repeating the trustee's sale proceeding. The Company may take any appropriate action under the terms of this Guarantee, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this Guarantee. If the Company shall exercise its rights under this paragraph, it shall do so diligently.
   b. If the Company elects to exercise its options as stated in Paragraph 4.a. the Company shall have the right to select counsel of its choice (subject to the right of the Assured to object for reasonable cause) to represent the Assured and shall not be liable for and will not pay the fees of any other counsel, nor will the Company pay any fees, costs or expenses incurred by the Assured in the defense of those causes of action which allege matters not covered by this Guarantee.

   c. Whenever the Company shall have brought an action or interposed a defense as permitted by the provisions of this Guarantee, the Company may pursue any litigation to final determination by a court of competent jurisdiction and expressly reserves the right, in its sole discretion, to appeal from an adverse judgment or order.
   d. In all cases where this Guarantee permits the Company to prosecute or provide for the defense of any action or proceeding, the Assured shall secure to the Company the right to so prosecute or provide for the defense of any action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the Assured for this purpose. Whenever requested by the Company, the Assured, at the Company's expense, shall give the Company all reasonable aid in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or lawful act which in the opinion of the Company may be necessary or desirable to establish the correctness of the assurances set forth in Paragraph 3 of Schedule A. If the Company is prejudiced by the failure of the Assured to furnish the required cooperation, the Company's obligations to the Assured under the Guarantee shall terminate.

5. **Proof of Loss or Damage.**
   a. In addition to and after the notices required under Section 2 of these Conditions have been provided to the Company, a proof of loss or damage signed and sworn to by the Assured shall be furnished to the Company within ninety (90) days after the Assured shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the matters covered by this Guarantee which constitute the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the Assured to provide the required proof of loss or damage, the Company's obligation to the Assured under the Guarantee shall terminate.
   b. The Company may reasonably require the Assured to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Guarantee, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Assured shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Assured provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Assured to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this Guarantee as to that claim.

## TRUSTEE'S SALE GUARANTEE CONDITIONS (Continued)

5. Options to Pay or Otherwise Settle Claims: Termination of Liability.

In case of a claim under this Guarantee, the Company shall have the following additional options:

a. To Pay or Tender Payment of the Amount of Guarantee or to Purchase the Indebtedness.

   i. To pay or tender payment of the full amount of this Guarantee together with any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

   ii. To purchase the indebtedness secured by the Mortgage for the amount owing thereon, together with any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company so purchases such indebtedness, the owner thereof shall transfer, assign, and convey to the Company the indebtedness and the Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in Paragraphs 6.a.i. or 6.a.ii., all liability and obligations of the Company to the Assured under this Guarantee, other than to make the payment required in those paragraphs, shall terminate, including any duty to continue any and all litigation initiated by Company pursuant to Paragraph 4.

a. To Pay or Otherwise Settle With Parties Other Than the Assured or With the Assured.

   i. To pay or otherwise settle with other parties for or in the name of an Assured any claim assured against under this Guarantee. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

   ii. To pay or otherwise settle with the Assured the loss or damage provided for under this Guarantee, together with any costs, attorneys' fees, and expenses incurred by the Assured that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in Paragraphs 6. b.i. or 6.b.ii., the Company's obligations to the Assured under this Guarantee for the claimed loss or damage, other than the payments required to be made, shall terminate, including any duty to continue any and all litigation initiated by Company pursuant to Paragraph 4.

1. Limitation of Liability.

This Guarantee is a contract of Indemnity against actual monetary loss or damage sustained or incurred by the Assured who has suffered loss or damage by reason of reliance upon the assurances set forth in Paragraph 3 of Schedule A and only to the extent herein described, and subject to the Exclusions From Coverage and Conditions of this Guarantee.

a. The liability of the Company under this Guarantee to the Assured shall not exceed the least of:

   i. the amount of liability stated in Schedule A;

   ii. the amount of the unpaid principal indebtedness secured by the Mortgage as limited or as reduced under Paragraph 8 of these Conditions at the time the loss or damage assured against by this Guarantee occurs, together with interest thereon; or

   iii. the difference between the value of the estate or interest set forth in Schedule A and the value of the estate or interest subject to any defect, lien, encumbrance or other matter assured against by this Guarantee.

a. If the Company or the Assured under the direction of the Company at the Company's expense establishes the title, or removes the alleged defect, lien or, encumbrance or cures any other matter assured against by this Guarantee in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

b. In the event of any litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom.

c. The Company shall not be liable for loss or damage to the Assured for liability voluntarily assumed by the Assured in settling any claim or suit without the prior written consent of the Company.

2. Reduction of Liability or Termination of Liability.

All payments under this Guarantee, except payments made for costs, attorneys' fees and expenses pursuant to Paragraph 4 shall reduce the amount of liability pro tanto.

3. Payment of Loss.

a. No payment shall be made without producing this Guarantee for endorsement of the payment unless the Guarantee has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

b. When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions the loss or damage shall be payable within thirty (30) days thereafter.

4. Subrogation Upon Payment or Settlement.

Whenever the Company shall have settled and paid a claim under this Guarantee, all right of subrogation shall vest in the Company unaffected by any act of the Assured.

The Company shall be subrogated to and be entitled to all rights and remedies which the Assured would have had against any person or property in respect to the claim had this Guarantee not been issued. If requested by the Company, the Assured shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Assured shall permit the Company to sue, compromise or settle in the name of the Assured and to use the name of the Assured in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Assured the Company shall be subrogated to all rights and remedies of the Assured after the Assured shall have recovered its principal, interest, and costs of collection.

5. Arbitration.

Either the Company or the Assured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Assured arising out of or relating to this Guarantee, any service in connection with its issuance or the breach of a Guarantee provision, or to any other controversy or claim arising out of the transaction giving rise to this Guarantee. All arbitrable matters when the amount of liability in Schedule A is $2,000,000 or less shall be arbitrated at the option of either the Company or the Assured. All arbitrable matters when the amount of liability in Schedule A is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Assured. Arbitration pursuant to this Guarantee and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**TRUSTEE'S SALE GUARANTEE CONDITIONS (Continued)**

6.   Liability Limited to This Guarantee; Guarantee Entire Contract.

   a.   This Guarantee together with all endorsements, if any, attached hereto by the Company is the entire Guarantee and contract between the Assured and the Company. In interpreting any provision of this Guarantee, this Guarantee shall be construed as a whole.

   b.   Any claim of loss or damage, whether or not based on negligence, or any action asserting such claim, shall be restricted to this Guarantee.

   c.   No amendment of or endorsement to this Guarantee can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

7.   Notices, Where Sent.

   All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this Guarantee and shall be addressed to the Company at **First American Title Insurance Company, Attn: Claims National Intake Center, 5 First American Way, Santa Ana, California 92707.  Phone: 888-632-1642 ([claims.nic@firstam.com](mailto:claims.nic@firstam.com)).**

| First American Title™ | **CLTA Form No. 22 Trustee's Sale Guarantee** |
|---|---|
| | ISSUED BY<br>**First American Title Insurance Company** |
| **Schedule A** | GUARANTEE NUMBER<br>**5030200A-8766520** |
| Form 5030200-A (2-16-17) | CLTA Guarantee Form No. 22 – Trustee's Sale Guarantee (Rev 11-4-16) |

**Order #: 8766520**                                          **Liability: $1,156,723.48**
**Reference #: 6334790**

**Date of Guarantee: AUGUST 19, 2020 AT 7:30 AM**            **Fee: $1,277.00**

1. Name of Assured:

   **FIRST AMERICAN TITLE INSURANCE COMPANY, A NEBRASKA CORPORATION, AS TRUSTEE AND FROME WYE LIMITED, AS BENEFICIARY**

2. The estate or interest in the Land that is the subject of this Guarantee is:

   **A FEE AS TO PARCEL ONE, AN EASEMENT AS TO PARCEL TWO.**

3. Assurances

   According to the Public Records as of the Date of Guarantee:

   a. Title to the estate or interest is vested in:

      **SPENCER HOSIE AND DIANE S. RICE, HUSBAND AND WIFE, AS COMMUNITY PROPERTY**

   b. Title to the estate or interest is subject to defects, liens or encumbrances shown in Schedule B which are not necessarily shown in the order of their priority.

   c. The Land referred to in this Guarantee is situated in the State of California, County of **MARIN**, **CITY OF BELVEDERE TIBURON** and is described as follows:

PARCEL ONE:

PARCEL 1, AS SHOWN UPON THAT CERTAIN PARCEL MAP ENTITLED, "PARCEL MAP OF DIVISION OF LOTS 2 & 3, BLOCK 49 AND A PORTION OF BELVEDERE AVE., MAP #4 OF BELVEDERE PENINSULA (RACK 1 PULL 11), BELVEDERE", FILED FOR RECORD JANUARY 23, 1974 IN VOLUME 9 OF PARCEL MAPS, AT PAGE 61, MARIN COUNTY RECORDS.

PARCEL TWO:

EASEMENT FOR SEWER AND UTILITY PURPOSES, 10 FEET IN WIDTH, APPURTENANT TO PARCEL ONE ABOVE DESCRIBED, LYING NORTHWESTERLY OF AND CONTIGUOUS TO THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE SOUTHEASTERLY LINE OF LOT 2, BLOCK 49, AS SHOWN UPON THAT CERTAIN MAP ENTITLED, "MAP NO. 4 OF BELVEDERE PENINSULA", FILED FOR RECORD AUGUST 12, 1895 IN RACK 1, PULL 11, MARIN COUNTY RECORDS, WHICH POINT BEARS SOUTH 44° 44' WEST 154.68 FEET TO THE MOST EASTERLY CORNER OF THE AFORESAID LOT 2; RUNNING THENCE FROM SAID POINT OF BEGINNING ALONG SAID LOT LINE AND ITS EXTENSION SOUTHWESTERLY SOUTH 44° 44' WEST 100 FEET TO A POINT IN THE NORTHEASTERLY LINE OF BELVEDERE AVE., AS REALIGNED ON THAT CERTAIN MAP ENTITLED, "MAP OF RESUBDIVISION OF PORTIONS OF THE CITY OF BELVEDERE", FILED FOR RECORD FEBRUARY 20, 1937 IN VOLUME 5 OF MAPS, AT PAGE 68, MARIN COUNTY RECORDS.

d.   Relative to the Deed of Trust shown in Paragraph **10** of Schedule B:

   i.   For the purposes of *California Civil Code §§ 2924b (b) and (d)*, the address of the trustor or mortgagor as shown in the Deed of Trust is:

   **SPENCER HOSIE**
   **331 GOLDEN GATE AVENUE**
   **BELVEDERE  CA 94920**
   **(TRUSTOR UNDER FCL DEED OF TRUST)**

   **DIANE S. RICE**
   **331 GOLDEN GATE AVENUE**
   **BELVEDERE  CA 94920**
   **(TRUSTOR UNDER FCL DEED OF TRUST)**

   ii.   The names and addresses of all persons who have recorded requests for a copy of notice of default and for a copy of notice of sale as provided by *California Civil Code §§ 2924b (a), (b) and (d)* are:

   **NONE**

   iii.   The names and addresses of all additional persons who are entitled to receive a copy of notice of default and a copy of notice of sale as provided by *California Civil Code §§ 2924b (c) (1), (2) and (3)* are:

   **SPENCER HOSIE**
   **331 GOLDEN GATE AVE**
   **BELVEDERE TIBURON  CA 94920-2444**
   **(VESTEE)**

   **DIANE S. RICE**
   **331 GOLDEN GATE AVE**
   **BELVEDERE TIBURON  CA 94920-2444**
   **(VESTEE)**

   iv.   The names and addresses of all associations defined in *California Civil Code §§ 4080 or 6528* that have recorded a request for notice that are entitled to receive a copy of any trustee's deed upon sale as provided by *California Civil Code § 2924b (f)* are:

   **NONE**

   v.   The names and addresses of all state taxing agencies that are entitled to receive a copy of notice of sale as provided by *California Civil Code § 2924b (c) (3)* are:

   **STATE OF CALIFORNIA FRANCHISE TAX BOARD**
   **SPECIAL PROCEDURES SECTION**
   **PO BOX 2952**
   **SACRAMENTO  CA 95812-2952**
   **(REGARDING ITEM #11)**

   vi.   The address of the Internal Revenue Service to which a copy of notice of sale is to be mailed as provided by *California Civil Code § 2924b (c) (4)* is:

   **INTERNAL REVENUE SERVICE**
   **ATTN: IRS ADVISORY GROUP**
   **1301 CLAY ST STE 1410 S**
   **OAKLAND  CA 94612**
   **(REGARDING ITEM #12)**

vii.  The name of each city in which the Land is located is:

**CITY OF BELVEDERE TIBURON**

If not in a city, each public notice district in which the Land is located is:

viii.  The name of a newspaper of general circulation for the publication of a notice of sale as required by _California Civil Code § 2924f (b) (1) and (2)_ is:

**MARIN SCOPE / MARIN SCOPE COMMUNITY NEWSPAPER**
**1301 B GRANT AVE.,**
**NOVATO, CA 94945**
**415-892-1516**
**415-897-0940**
**PUBLISHED: WEDNESDAY**
**DEADLINE: WEDNESDAY PRIOR**

| ![First American Title logo] First American Title™ | **CLTA Form No. 22 Trustee's Sale Guarantee** |
|---|---|
| | ISSUED BY **First American Title Insurance Company** |
| # Schedule B | GUARANTEE NUMBER **5030200B-8766520** |
| Form 5030200-B (2-16-17) | CLTA Guarantee Form No. 22 – Trustee's Sale Guarantee (Rev 11-4-16) |

File No.: 8766520

## EXCEPTIONS

1.  PLEASE NOTE THAT THIS GUARANTEE DOES NOT REPRESENT THE TRUE STATUS OF TITLE TO THE SUBJECT PROPERTY, BUT IS INTENDED SOLELY FOR THE PURPOSE OF PROCESSING A STATUTORY FORECLOSURE.

2.  GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR **2020-2021** A LIEN NOT YET DUE OR PAYABLE.

3.  GENERAL AND SPECIAL TAXES FOR THE FISCAL YEAR **2019-2020**
1ST INSTALLMENT:          **$22,877.04**, **PAID**
PENALTY AMOUNT:          **$0.00**
2ND INSTALLMENT:          **$22,877.04**, **PAID**
PENALTY AMOUNT:          **$0.00**
CODE AREA:                     **001-000**
A.P. NUMBER:                 **060-202-13**
EXEMPTION:                    **$7,000.00**
LAND AMOUNT:               **$1,616,830.00**
IMPROVEMENT:              **$1,727,474.00**
TOTAL AMOUNT:             **$3,337,304.00**

4.  THE LIEN OF SUPPLEMENTAL TAXES ASSESSED PURSUANT TO CHAPTER 3.5 COMMENCING WITH SECTION 75 OF THE CALIFORNIA REVENUE AND TAXATION CODE.

5.  THE PROPERTY COVERED HEREIN LIES WITHIN THE BOUNDARIES OF VARIOUS ASSESSMENT DISTRICTS AND ANY AMENDMENTS THERETO.

6.  EASEMENTS AND SERVITUDES AS THEY APPEAR ON MAPS, OR IN DOCUMENTS RECORDED IN THE OFFICIAL RECORDS OF SAID COUNTY.

7.  COVENANTS, CONDITIONS AND RESTRICTIONS IN INSTRUMENTS RECORDED IN THE OFFICIAL RECORDS OF SAID COUNTY AND ANY AMENDMENTS THERETO, WHICH PROVIDE THAT A VIOLATION THEREOF SHALL NOT DEFEAT OR RENDER INVALID THE LIEN OF ANY FIRST MORTGAGE OR DEED OF TRUST MADE IN GOOD FAITH AND FOR VALUE, BUT DELETING ANY COVENANT, CONDITION OR RESTRICTION INDICATING A PREFERENCE, LIMITATION OR DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN TO THE EXTENT SUCH COVENANTS, CONDITIONS OR RESTRICTIONS VIOLATE 42 USC 3604(C).

8.  A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS OF **$1,600,000.00**, AND ANY OTHER AMOUNTS OR OBLIGATIONS SECURED THEREBY, RECORDED **JULY 24, 1997** AS **INSTRUMENT NO. 97-039365** OF OFFICIAL RECORDS.
DATED:                          **JULY 17, 1997**
TRUSTOR:                     **SPENCER ROSIE AND DIANE S. RICE, HUSBAND AND WIFE**
TRUSTEE:                     **FIDELITY NATIONAL TITLE INSURANCE COMPANY**
BENEFICIARY:              **FIRST REPUBLIC SAVINGS BANK**

NOTE 1: AN INSTRUMENT ENTITLED "**CORPORATION ASSIGNMENT OF DEED OF TRUST**", RELATING TO THE ABOVE MENTIONED DEED OF TRUST, WAS RECORDED **MAY 15, 2012** AS **INSTRUMENT NO. 2012-0029976** OF OFFICIAL RECORDS, EXECUTED BY **FIRST REPUBLIC BANK** TO **CITIMORTGAGE, INC**.

NOTE 2: AN INSTRUMENT ENTITLED "**CORRECTIVE CORPORATION ASSIGNMENT OF DEED OF TRUST**", RELATING TO THE ABOVE MENTIONED DEED OF TRUST, WAS RECORDED **MARCH 06, 2014** AS **INSTRUMENT NO. 2014-0008277** OF OFFICIAL RECORDS, EXECUTED BY **FIRST REPUBLIC BANK, SUCCESSOR-IN-INTEREST TO FIRST REPUBLIC SAVINGS BANK** TO **CITIMORTGAGE, INC**.

9.  A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS OF **$2,200,000.00**, AND ANY OTHER AMOUNTS OR OBLIGATIONS SECURED THEREBY, RECORDED **AUGUST 25, 2009** AS **INSTRUMENT NO. 2009-0049326** OF OFFICIAL RECORDS.

DATED:                     **AUGUST 2009**
TRUSTOR:                   **SPENCER HOSIE AND DIANE RICE, HUSBAND AND WIFE**
TRUSTEE:                   **STEWART TITLE GUARANTY COMPANY, A TEXAS CORPORATION**
BENEFICIARY:               **PERKINS COIE LLP, A WASHINGTON LIMITED LIABILITY PARTNERSHIP**

10.  A DEED OF TRUST TO SECURE AN ORIGINAL INDEBTEDNESS OF $**2,000,000.00**, AND ANY OTHER AMOUNTS OR OBLIGATIONS SECURED THEREBY, RECORDED **OCTOBER 11, 2018** AS **INSTRUMENT NO. 2018-0035545** OF OFFICIAL RECORDS.
DATED:                     **OCTOBER 10, 2018**
TRUSTOR:                   **SPENCER HOSIE AND DIANE S. RICE, HUSBAND AND WIFE**
TRUSTEE:                   **FIRST AMERICAN TITLE INSURANCE COMPANY, A NEBRASKA CORPORATION**
BENEFICIARY:               **FROME WYE LIMITED, INCORPORATED AND REGISTERED IN ENGLAND AND WALES**

NOTE 1: A NOTICE OF DEFAULT RECORDED **AUGUST 19, 2020** AS **INSTRUMENT NO. 2020-0037612** OF OFFICIAL RECORDS.

11.  A LIEN IN FAVOR OF THE STATE OF CALIFORNIA, EVIDENCED BY A CERTIFICATE ISSUED BY THE FRANCHISE TAX BOARD, RECORDED **JANUARY 25, 2019** AS **INSTRUMENT NO. 2019-0002334** OF OFFICIAL RECORDS.
DEBTOR:                    **SPENCER HOSIE, DIANE S RICE**
CERTIFICATE NO.:           **19017336690**
AMOUNT:                    **$619,232.46 AND ANY OTHER AMOUNTS DUE THEREUNDER**

12.  A FEDERAL TAX LIEN IN FAVOR OF THE UNITED STATES OF AMERICA, RECORDED **JANUARY 07, 2020** AS **INSTRUMENT NO. 2020-0000688** OF OFFICIAL RECORDS.
SERIAL NO.:                **399357319**
DEBTOR:                    **SPENCER HOSIE & DIANE S RICE**
AMOUNT:                    **$2,466,446.52, AND ANY OTHER AMOUNTS DUE THEREUNDER.**

13.  ANY BANKRUPTCY PROCEEDING THAT IS NOT DISCLOSED BY THE ACTS THAT WOULD AFFORD NOTICE AS TO SAID LAND, PURSUANT TO TITLE 11 U.S.C. 549(C) OF THE BANKRUPTCY REFORM ACT OF 1978.


INFORMATIONAL NOTE:

FIRST AMERICAN ASSUMES NO LIABILITY FOR ANY INACCURACIES OR OMISSIONS OF THE STREET ADDRESS PURPORTED BY THE LATEST COUNTY ASSESSOR'S ROLL. THAT ADDRESS IS:

**331 GOLDEN GATE AVE, BELVEDERE TIBURON, CA 94920-2444**

**APN: 060-202-13**

| First American Title™ | **CLTA Form No. 22 Trustee's Sale Guarantee** |
|---|---|
| | ISSUED BY **First American Title Insurance Company** |
| # Informational Notes | GUARANTEE NUMBER **5030200-8766520** |
| Form 5030200-INFO (2-16-17) | CLTA Guarantee Form No. 22 – Trustee's Sale Guarantee (Rev 11-4-16) |

File No.: 8766520

### INFORMATIONAL NOTES

No assurances as set forth in Paragraph 3 of Schedule A are provided in connection with the following information and the Company assumes no liability for any inaccuracies in or omissions from the information. This information is not intended to be comprehensive and does not necessarily include all laws and regulations that might affect the contemplated foreclosure.

1. Attention is called to Article I commencing with California Civil Code Sections 2920 et. seq, of Chapter 2, Title 14, Part 4, Division 3, that govern the actions of mortgagees, beneficiaries, mortgage servicers, trustees, and their agents with respect to non-judicial foreclosures.

2. Attention is called to the Servicemembers Civil Relief Act *(50 USC §§3901 et seq.),* the Military Reservist Relief Act of 1991 (California Military and Veterans Code §§ 800 et seq.), and Military and Veterans Code § 408, that contain restrictions against the sale of land under a deed of trust or mortgage if the owner is entitled to the benefits of those laws.

3. Attention is called to the Federal Tax Lien Act of 1966 (26 USC §§ 6321 et seq.), that, among other things, provides for the giving of written notice of sale in a specified manner to the Secretary of Treasury or his or her delegate as a requirement for the discharge or divestment of a Federal Tax Lien in a nonjudicial sale, and establishes with respect to that lien a right in the United States to redeem the property within a period of 120 days from the date of the sale.

4. Attention is called to California Government Code § 16187, that, among other things, provides for the giving of written notice of sale in a specified manner to the Controller of the State of California necessary for the discharge or divestment in a nonjudicial sale of a Notice of Lien for Postponed Property Taxes recorded in the public records subsequent to the recording of a notice of default.

*[The inclusion, arrangement and language of the matters shown in the above Informational Notes to be in accordance with the practices of the issuing member company.]*