Spencer Hosie (CA Bar No. 101777)
shosie@hosielaw.com
Diane S. Rice (CA Bar No. 118303)
drice@hosielaw.com
HOSIE RICE LLP
505 Sansome Street, Suite 1575
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax

*Attorneys for Defendants*
*HOSIE RICE LLP, SPENCER HOSIE and*
*DIANE S. RICE*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| FROME WYE LIMITED, | Case No. 4:23-cv-06153-EMC |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO** |
| v. | **PLAINTIFF FROME WYE LIMITED'S** |
| | **AMENDED MOTION FOR** |
| HOSIE RICE LLP, a California limited liability | **TEMPORARY RESTRAINING ORDER** |
| partnership; SPENCER HOSIE, an individual; | |
| DIANE RICE, an individual, | Hearing:  TBD |
| Defendants. | Trial Date: Not set |

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA 94111

I.      **INTRODUCTION AND SUMMARY**.

Frome Wye Limited's ("Woodsford") Temporary Restraining Order ("TRO") motion turns on a profound error of law.  Woodsford asserts, with no case support, that the 2018 lien is choate and fully perfected.  It is not.  A lien is inchoate if uncertain as to amount.  *See* below § II.  A senior in time but inchoate lien is junior to a later in time IRS lien.  This, too, is basic law.  *See* § II below.  The tax liens have priority, period.  Woodsford's blithe assertion to the contrary that it is a "secured creditor with a perfected deed of trust lien" does not make it so.

First, the lien reflects contingency litigation financing.  This is not like a mortgage where the homeowner gets a concrete sum of money which must be paid back.  Litigation finance is **contingent**.  What is repaid, if anything, is a function of how the cases go.  Woodsford yet now continues to contest the amount due.

Woodsford's TRO omits perhaps the most pertinent point: under the Law Finance Funding Agreement ("LFA"): the Firm has the **right** to sell the real estate, and Woodsford cannot object, **if** the Firm offered comparable or better security.  Woodsford, now, has **no** security, as its lien is under water.  In writing, the Firm offered much better security, *e.g.*, accounts receivable of circa $1.2 million (money owed to the Firm by clients, plus a judgment now being enforced), plus a first position in **all** of the Firm's current or prospective cases.  More, the Firm offered to increase the amount due by $500,000 if repayment took a year, and $1 million if repayment took more than a year.  Woodsford ignored this offer, yet refused to substitute security, as the contract Woodsford itself wrote requires.  With this offer, Woodsford has no risk of irreparable harm.

All of this is factual.  None of this is fairly disputed.  But Woodsford says nothing of this in its TRO motion papers.  Sherlock Holmes was right: sometimes it is the dog that does not bark that speaks most clearly.

///

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA  94111

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA 94111

## II.    STATEMENT OF THE FACTS.

Woodsford is a litigation finance company that invests money in ongoing cases in return for a percentage of any contingency fee recovered.[1]  This is explicit in its website, and indeed in the term sheet Woodsford drafted for the Hosie Rice firm.  *See* below.

This is a high-risk, high-reward business.  The money advanced is non-recourse, and so if the case is lost, Woodsford recovers nothing.

And so it was here: Woodsford received a 26% compounding annual interest rate plus the first payment of $250,000 as an interest "prepayment."

That this was a contingency fee investment was explicitly discussed between the parties, both in person and in writing.  There was **no** ambiguity here.  For example, here is what Woodsford's own Term Sheet stated:

> Woodsford proposes a $1m Revolving Facility, where repayment to Woodsford is **contingent** upon Hosie Rice's receipt of **contingency fees** from its current portfolio of cases, including Space Data.

*See* Ex. A attached to the Declaration of Spencer Hosie (emphasis ours).  Could this be any more clear?

The parties closed the litigation financing contract in October 2018, and the Firm thereafter drew down $550,000 between October and mid-December 2018.  In mid-December, the Firm settled one of the listed contingency fee cases, and within days repaid Woodsford the $550,000 advanced plus the mandatory $250,000 interest "prepayment."

It is undeniable that Woodsford owed the Firm money as of January 2019, as against the contrary.  This matters in determining lien priority, as set forth below.

Between January and May 2019, the Firm drew down an additional $800,000, all to fund a large Google case.  In May, Woodsford said the Firm had exhausted the line and refused to provide

---

[1] Woodsford's papers assert that the sale is to close on December 1.  This is inaccurate.  The sale is not set to close until December 8.

1    any additional funding.

2    Many months later, and on the Courthouse steps, the Firm settled the Google case (after an

3    adverse patent infringement Summary Judgment ruling) for $8 million.  The C.E.O. of the Firm's

4    client—the son of the majority shareholder—then refused to pay the Firm any fee, hourly or

5    contingent, and hired his college roommate to be his lawyer going forward on the Federal Circuit

6    appeal.  (That worked as well as one might expect—the appeal was dismissed with a terse Rule 36

7    affirmance).

8

9    Meanwhile, the Firm filed an arbitration to get paid and the client counterclaimed for breach

10   of fiduciary duty and malpractice, as delinquent clients tend to do.  The client argued that it owed

11   nothing, and indeed should recover millions of dollars of fees paid earlier.

12   The arbitrator disagreed, and essentially rendered Solomonic justice by awarding the Firm

13   $4 million for its hourly fees incurred.  This was a large portion of the Firm's due "regardless of

14   outcome" hourly fees.  **This was not a recovery of any contingency fee of any sort in any way.**

15

16   Under the governing Woodsford-Hosie Rice LFA, Woodsford had an interest in contingency

17   fee recoveries alone.  It did not have an interest in the Firm's monthly hourly fee revenue.  If the

18   converse were true, this high-risk, high-reward litigation finance deal transmuted into a bank loan

19   guaranteed by monthly fees but still carrying a compounding 26% interest rate with a mandatory

20   $250,000 interest fee payment (which the Firm in fact paid).

21

22   For reasons yet unclear to the Firm, an arbitration panel agreed with Woodsford and ruled,

23   without any testimony or evidence, that the contingency fee financing agreement included hourly

24   fees paid monthly.  This finding was directly contrary to Woodsford's own Term Sheet, which makes

25   clear that Woodsford was investing in contingency fee recoveries.  That the Firm recovered its hourly

26   fees through a fee arbitration should make no difference: the Firm recovered hourly fees, not

27   contingency fees, and Woodsford had no interest in the hourly fees recovered.

28

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA 94111

1    Arbitrators have the right to be wrong, even very wrong.  Much as it wishes otherwise, the

2    Firm cannot dispute this decision.

3    Yet, the dispute continues.  Woodsford is now asking Delaware Judge Colm Connolly to

4    award either additional prejudgment interest in the amount of $149,000 or $1.2 million in the

5    Delaware Action.  That matter has been fully briefed and submitted.

6

7    **III.**    **THE LAW ON PRIORITY OF LIENS AND THE CHOATENESS DOCTRINE.**

8    Only a choate lien has priority over a subsequent tax lien.  To become choate, three elements

9    must be established: (i) the identity of the secured party, (ii) the property subject to the lien, and (iii)

10   the amount of the lien. *J.D. Court, Inc. v. United States,* 712 F.2d 258, 263 (7th Cir. 1983).

11   The Supreme Court has determined a state lien to be "perfected" only when "'the identity of

12   the lienor, the property subject to the lien, and the amount of the lien are established.'"  *United States*

13   *v. McDermott*, 507 U.S. 447, 462, 113 S.Ct. 1526, 1528, 123 L.Ed.2d 128 (1993) (quoting *City of*

14   *New Britain*, 347 U.S. at 84, 74 S.Ct. at 369); *see also* Treas. Reg. § 301.6323(h)–1(g) (1976).

15   According to the Supreme Court, "it is a matter of federal law when such a [state] lien has acquired

16   sufficient substance and has become so perfected as to defeat a later-arising or later-filed federal tax

17   lien." *United States v. Pioneer Am. Ins. Co*., 374 U.S. 84, 88, 83 S.Ct. 1651, 1655, 10 L.Ed.2d 770

18   (1963) (footnote omitted). "Consequently, state-law limitations upon the ability of general creditors

19   to reach a taxpayer's property do not affect the attachment of federal tax liens because the state-law

20   consequences flowing from a property interest properly defined under state law 'are of no concern

21   to the operation of the federal tax law.' " *United States v. Safeco Ins. Co.,* 870 F.2d 338, 340-41 (6th

22   Circuit 1989) (quoting *National Bank of Commerce*, 472 U.S. at 723, 105 S.Ct. at 2926).

23   Under Federal law, in order for a lien to be choate, the amount of the lien has to be

24   determined. As the court in *Wellington Condominium v Pino,* 686 F. Supp. 2d 117 (2010) held:

25   In arguing that its lien takes priority over that of the United States,
     WCT relies on the fact that under Massachusetts law, its lien was

26

27

28

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA  94111

perfected in 1984 when it filed the Master Deed, whereas the United States did not perfect its claim until 2004.  However, in order for a lien to be choate under federal law, the amount of the lien has to have been determined.  (Emphasis added). *See id.* at 90, 83 S.Ct. at 1656 (where amount of attorneys' fees incurred in connection with foreclosure was not fixed until foreclosure decree entered, fees were inchoate until then, and were subordinate to previously filed federal tax lien). At the time the Master Deed was filed in 1984, the amounts due were not ascertainable because they had not become due. While the 1984 filing serves to establish both the identity of the lienor (WCT) and the property subject to the lien (the Property), the amount of the lien was undetermined as of that time.  Because the lien amount remained uncertain at the time the United States filed its liens, WCT's lien was inchoate. *See In re Henderson*, 155 B.R. 10, 12 (Bankr. S.D. Ca. 1993) (holding that condominium association's lien as to future unpaid dues was inchoate because amount of lien was impossible to ascertain); *Bromberg,* 2007 WL 1201454, at *5 (holding that federal tax lien takes priority over the lien of condominium association where the amount of the association's lien was not "established prior to the filing of the federal tax lien"). Because WCT's lien was inchoate at the time the United States filed its lien, the tax lien is first in time and takes priority.

*Id.* 123 *6.

Liens that may become certain to an amount in the future at some date subsequent to the date of a federal lien cannot displace the federal liens. *US v City of New Britain*, 74 S. Ct. 367, 372-73 (1954).  The Court discussed *The United States v. Security Trust & Savings Bank*, 340 U.S. 47, 49 (1950) case which involved an inchoate attachment lien that had not ripened into a judgment at the time the federal tax liens attached. The Court noted that: '(n)umerous contingencies might arise that would prevent the attachment lien from ever becoming perfected by a judgment awarded and recorded.' 340 U.S. at page 50, 71 S.Ct. at page 113. Thus, the attachment lien was 'merely a lis pendens notice that a right to perfect a lien exists.'  Ibid. Such inchoate liens may become certain as to amount, identity of the lienor, or the property subject thereto only at some time subsequent to the date the federal liens attach and cannot then be permitted to displace such federal liens. Otherwise, a State could affect the standing of federal liens, contrary to the established doctrine, simply by

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA  94111

causing an inchoate lien to attach at some arbitrary time even before the amount of the tax, assessment, etc., is determined. "Accordingly, we hold 'that the tax liens of the United States are superior to the inchoate attachment lien * * *.'" *Id.*, 340 U.S. at page 51, 71 S. Ct. at page 114.

Courts dealing with conflicts between state law security interests and tax liens, tend to cite the principle that "[w]hile the existence and precise nature of an interest is determined according to state law, the issue of priority between conflicting interests is settled according to federal law." *Id.* at *8 (citing *Aquilino v. United States*, 363 U.S. 509, 513-14 (1960)). Under the choateness doctrine, a security interest that has otherwise attached and been perfected under state law prior to the filing of the tax lien only "attaches" relative to that tax lien when it becomes choate.

In *United States v. Pioneer American Insurance Company*, 83 S. Ct. 1651, * 88 (1963), the court found that it is a matter of federal law when such a lien has acquired "sufficient substance and has become so perfected as to defeat a later-arising or later-filed federal tax lien. 'Otherwise, a State could affect the standing of federal liens, contrary to the established doctrine, simply by causing an inchoate lien to attach at some arbitrary time even before the amount of the tax, assessment, etc., is determined.'" *United States v. New Britain*, supra, 347 U.S. at 86, 74 S.Ct. at 371. The federal rule is that liens are "perfected in the sense that there is nothing more to be done to have a choate lien— when the identity of the lienor, the property subject to the lien, and the amount of the lien are established." *Id.*, 347 U.S. at 84, 74 S.Ct. at 369. Similarly, in *United States v. Acri*, 348 U.S. 211, 75 S.Ct. 239, 99 L.Ed. 264 (1955), the Supreme Court unequivocally held that a federal tax lien filed after an attachment lien was executed had priority over the lien because judgment on the attachment lien did not occur until after the filing of the tax lien. *Id.* at 214, 75 S.Ct. at 241–42. In *Acri,* the Court was not persuaded by the recognition of the attachment lien as perfected under Ohio law. *Id.* at 213, 75 S.Ct. at 241. Rather, for "federal tax purposes" the lien was "inchoate ... because, at the time the attachment issued, the fact and the amount of the lien were contingent upon the outcome of

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA  94111

1    the suit for damages." *Id.* at 214, 75 S.Ct. at 241.

2    ### IV.    WOODSFORD DOES NOT HAVE A PERFECTED LIEN.

3          Woodsford's lien was not perfected, but rather a placeholder that Woodsford might be owed

4    "up to $2 million."  When Woodsford recorded this lien, the Firm owed Woodsford **nothing**.  In

5    January of the following year, Woodsford owed the Firm circa $236,000.  And even now, the amount

6

7    due is the subject of ongoing litigation.

8          Under federal law, Woodsford does not have a perfected lien, and the temporally junior

9    Service lien has priority.  This neither is a simple nor nuanced matter: the law is clear.  This lien

10   priority issue is what drives Woodsford's TRO motion, which makes it all the more peculiar that

11   Woodsford never addresses the real issue in its moving papers.

12         Woodsford filed this case and TRO to try to blow up the real estate sale in an effort to get

13   unfair settlement leverage.  This is the pure, untarnished truth of it.  Its TRO is defective legally,

14

15   factually false, and driven entirely by malice.

16   ### V.    WOODSFORD HAS BREACHED THE CONTRACT.

17         Under § 13.6 of the LFA, Woodsford **must** remove its lien if offered comparable or better

18   security.  *See* Hosie Decl., Ex. B.  This was a carefully negotiated provision.  As Woodsford's lien

19   is under water, it has **no** security now.  In an effort to close the sale, the Firm offered Woodsford

20   circa $1.2 million in assigned accounts receivable (money due from clients) plus a first interest in all

21   of the Firm's current and future cases (with the exception of a large case against Meta now on appeal

22   in the Federal Circuit).

23

24         Woodsford ignored this offer, and instead filed this case and TRO.

25   ### VI.    CONCLUSION.

26         For the reasons set forth herein, the Firm respectfully requests that this Court deny

27   Woodsford's TRO motion and rule that the Woodsford lien is junior in priority to the Service liens

28

Hosie Rice LLP
505 Sansome Street, Suite 1575
San Francisco, CA 94111

and that Woodsford has a contractual obligation to accept comparable or better security.  With its

lien under water, the Firm's offer of alternate security puts Woodsford in a much more secure place.

How can Woodsford complain about this?

Dated:  December 1, 2023                              Respectfully submitted,


                                                     /s/ Spencer Hosie
                                                     SPENCER HOSIE (CA Bar No. 101777)
                                                     shosie@hosielaw.com
                                                     DIANE S. RICE (CA Bar No. 118303)
                                                     drice@hosielaw.com
                                                     HOSIE RICE LLP
                                                     505 Sansome Street, Suite 1575
                                                     San Francisco, CA 94111
                                                     (415) 247-6000 Tel.
                                                     (415) 247-6001 Fax

                                                     *Attorneys for Defendants*
                                                     *HOSIE RICE LLP, SPENCER HOSIE, and DIANE S.*
                                                     *RICE*